[L. A. No. 15425. In Bank.—March 31, 1936.]

In the Matter of the Estate of LOWELL SHERMAN, Deceased. JULIA LOUISE SHERMAN, Appellant, v. MORRY COHN, Petitioner; CITIZENS' NATIONAL TRUST & SAVINGS BANK OF LOS ANGELES, as Special Administrator, etc., Respondent.

Simon & Garbus, Abram Robert Simon and Morton Garbus for Appellant.

Albert E. Sherman, Austin C. Sherman and Cosgrove & O'Neil for Respondent.

SEAWELL, J.—This appeal is from an order and judgment removing Mrs. Julia Louise Sherman as executrix of the last will of her deceased son, Lowell Sherman, and revoking letters testamentary theretofore issued to her in said estate matter.

Mrs. Sherman instituted proceedings by petition for the removal of her coexecutor, Morry Cohn, on April 9, 1935, and Mr. Cohn retaliated thirteen days thereafter—April 22d —by filing a petition praying for her removal. Mrs. Sherman requested in her petition for removal of Mr. Cohn that she be permitted to act as the sole and only executor. Mr. Cohn rejoined by offering in writing to act as the sole executor in the event the court should remove Mrs. Sherman. The proceedings were consolidated for the purpose of hearing and both parties (hereafter referred to as executors) were by the court's order and judgment removed from office and their respective letters testamentary were revoked. Mrs. Sherman has appealed from said order and judgment of removal and revocation but no appeal was taken by Cohn, and the order has become final as to him.

On May 22, 1935, while proceedings were pending, Cohn filed his resignation to become final upon its acceptance by the court. No action was taken on his resignation by the court until the judgment was pronounced wherein said resig-

nation was accepted after his removal had become accomplished.

The findings contain a recital that Cohn offered to resign as coexecutor, "provided the court would appoint a disinterested administrator with the will annexed . . . in place of Julia Louise Sherman as co-executrix and Morry Cohn as co-executor". Just what materiality said finding has to the proceedings is not apparent, inasmuch as the wishes or desires of an executor who resigns or who has actually been removed for cause and who has no beneficial interest in the estate are of no consequence and should not be considered for any purpose, advisory or otherwise, in the matter of the removal of a coexecutor or in the selection of a successor of the one removed. The written resignation of Cohn was absolute and free from conditions of any kind, as it must have been to meet the requirements of a resignation. The proposition of Cohn that he would resign provided the court would remove Mrs. Sherman from the executorship was a matter that was entitled to no consideration whatever in the determination of the question as to whether the mother of the decedent, who was his sole heir under the will, had forfeited her right to administer upon his estate. An early incipient breach between the executors was widened by Mr. Cohn's action in procuring the allowance of two claims presented on his own behalf without notifying Mrs. Sherman of his intention to present them to the judge for allowance, and without informing the judge of Mrs. Sherman's objections thereto, well knowing her opposition to their allowance, and also on account of his failure to inventory or account for certain real and personal property which it is claimed was purchased with the decedent's money. Mr. Cohn's proposal to resign in the event of Mrs. Sherman's removal would have eliminated her authority to disallow his asserted claims and he would at least have gained the opportunity of securing their allowance by a single administrator appointed in accordance with his proposed plan. In all cases where real controversial grounds exist as to the allowance of claims against the estate of a deceased person the party asserting such claims should be put to his proof in establishing the validity of the same in the tribunal established for such purpose. Especially is this true where the party making the claims occupies

a close confidential and business relation with the decedent, as shown in the instant case.

There never was, at any time, a question as to the estate's solvency. Practically at all times the amount of cash on hand was amply sufficient to take care of the estate's indebtedness, to say nothing of valuable real and personal property, stocks and solvent securities as assets belonging to the estate.

Mrs. Sherman was a widow at the time of her son's death, sixty-four years of age. He left no wife, children, brother or sister. The next of kin were his mother and an uncle and aunt. The mother and son resided together in a home owned by him situate in Beverly Hills, county of Los Angeles. The mother owned real property in her own right and it appears that she was fairly comfortably situated so far as finances go.

Lowell Sherman died December 28, 1934, at the age of forty-six years. He had been in poor health for a time—the duration of which does not appear in the record—prior to his demise. Evidently he was quite prominent in the motion picture industry as an actor and director and had enjoyed financial success commensurate with his prominence in motion picture circles. The appraised value of the estate, as found by the court, was $256,235.31, and the approximate amount of creditors' claims, including federal and state inheritance taxes, federal income taxes and expenses of administration, would be approximately the sum of $80,000, leaving a clear balance of $176,623.51 to be distributed solely to Mrs. Sherman. The estate, according to the statement made by the attorney for the executors, who withdrew from the case at about the time the removal proceedings were before the court, was liquid, and was practically ready to be closed. This was no doubt correct, except as to the validity of certain money claims made by Cohn against the estate and the conflicting claims of Cohn and Mrs. Sherman as to the ownership of certain securities and real property to which Cohn made claim and refused to inventory. These matters precipitated the proceedings.

Letters testamentary were issued to Julia Louise Sherman and Morry Cohn on January 30, 1935, and they entered upon the performance of their duties. There was no serious discord until shortly before Morry Cohn presented for approval two claims against the estate, one in the sum of $2,670.32, that

sum being one-half of the proceeds of Pacific Shore Oil Company stock, property of Mr. Sherman, and the second for the sum of $3,385.55 on account of alleged increased salary allowances made by decedent during the last few months of his life.

Morry Cohn had been in the employ of Lowell Sherman as secretary and business manager for approximately seven years prior to his death. By no means does he make definite by his testimony the amount of salary he was receiving prior to and at the time that decedent apparently surprised him by a gratuitous and exceedingly generous raise in his salary. There is evidence tending to show that he was receiving $75 per week up to and including the larger portion of the year 1934, at which time he claims that his salary was increased to $10,000 per year, and in addition thereto he was to receive ten per cent of the yearly gross income of decedent on all sums over and above the sum of $125,000. His coexecutor disputed the validity of the claim for $2,670.32, which, according to Cohn's own evidence, was at best but a gratuity on the part of the decedent, and also the second claim of $3,385.55, claimed as increase in salary. Both claims rest upon evidence which the application of the rule of inherent improbability would subject to a severe strain. Section 1880, subdivision 3 of the Code of Civil Procedure excludes a claimant from testifying in his own behalf against the estate of a deceased person. He called as his principal witness to approve both claims Wilbur D. Nichols, chief personal property appraiser of Los Angeles, and a restorer of damaged paintings, a friend of both Cohn and Sherman, who testified that he was a frequent visitor at the home of decedent; that during the latter part of March, 1934, he visited the home of Sherman and as he entered the house he heard a heated argument between Cohn and decedent. He heard Mr. Sherman, in spirited terms, say, "Well, you will," and Mr. Cohn say, "You won't," [meaning he would not accept] and he heard the names of the Mdivani boys mentioned a few times, and then Lowell Sherman left the room, saying as he left, "Well, think it over." The witness asked Mr. Cohn what all the shouting was about. Sherman returned to the room and asked Cohn what he had decided to do about the Pacific Shore oil stock sale. Cohn said, "I don't like to do that, I don't like to take that money; I don't feel it is mine, that is rightfully yours,"

and Mr. Sherman said, "Well, suppose we split it and settle the deal that way." Mr. Sherman said, "What did you decide, Morry, are you going to take that?" and Cohn said, "Well, I don't feel as though I should," and Mr. Sherman said, "Well, let's split it and call it even," and Cohn said, "All right, we'll settle it that way." It is this sum which Mr. Cohn said he reluctantly consented to accept that he now seeks to enforce payment of. The witness further testified that this conversation was referred to every time he saw Mr. Sherman "from then on for the rest of the summer."

The same witness testified that he had a conversation with Mr. Sherman with respect to the salary of Morry Cohn during the latter part of July or the fore part of August, 1934. According to his story, Mr. Sherman called him to his home with respect to restoring a painting and after he had finished his work Sherman asked him what he thought he should do with Mr. Cohn in the way of a salary increase and he replied that he did not have any say in the matter. Sherman said he could not get Cohn to take anything but just a nominal salary for his work and he thought he owed him a good deal more than he was paying him. Sherman asked the witness what he thought of a salary of $10,000 a year plus ten per cent of his gross income over $125,000 per year. The witness said he thought that a "pretty sweet salary", but he thought that Cohn earned it. Sherman then said he would surprise Cohn when he returned from his vacation. George H. Rudd, certified public accountant, was employed by Mr. Sherman to expert Mr. Cohn's book accounts but his report was not finished until a few days before Mr. Sherman died. Certain entries made by Cohn and favorable to his contentions, but which Sherman never saw, appear in Rudd's report. Sherman never saw the report as finally finished, as it was delivered to Mr. Cohn personally, presumably by reason of Sherman's illness. It is claimed by Mr. Cohn that said audits, except for the short period preceding Mr. Sherman's death, as progressively prepared were presented to him and that the initials "L. S." endorsed thereon were made by him. The audit of Cohn's accounts was made for the information of Sherman as to Cohn's stewardship.

The accounts of Mr. Cohn were rather indefinite in several respects and he seemed unable to give satisfactory information as to certain matters relating to his personal transac-

tions with Sherman, about which there should be no uncertainty on the part of the manager and secretary, particularly as to the identification of the property owned by his employer as distinguished from any property claimed by the secretary. It further appears that the South Arnez drive property was bought in the name of Cohn and that at least $2,000 of Mr. Sherman's money went into the proposition. This sum, which Mr. Cohn says was a loan, has not been repaid. There also exists a dispute between the parties as to the ownership of three hundred shares of Bancamerica-Blair stock. There is an unadjusted difference as to whether or not the estate owns the whole or a part interest in those properties, which must be determined.

The action of Mr. Cohn in procuring the allowance of his personal claims by the probate court against the estate, without giving Mrs. Sherman notice of his intention to do so, knowing full well that she strongly opposed the allowance of said claims, and thereupon making out and signing checks for the payment of the same and presenting them to Mrs. Sherman for her signature was a proceeding well calculated to engender suspicion in her mind, thereby weakening the confidential relations that should exist between coexecutors.

It is unnecessary to point out all of the grounds upon which the action of Mrs. Sherman in refusing to allow Mr. Cohn's claims and her insistence upon an accounting with the estate as to ownership of the legal or equitable title of the South Arnez drive property and certain personal property in controversy, may be sustained upon reasonable grounds. Certainly it would not justify an order of removal. The proceedings instituted by her for the removal of the coexecutor have become final by the court's order and, as a matter of law, must be taken as supporting her action. Her refusal to allow said claims and her insistence to determine the ownership of property to which Cohn asserts a hostile claim as against the estate furnishes no evidence of bad faith on her part. The justification of the charges made by Mrs. Sherman for the removal of her coexecutor will not be further pursued, inasmuch as no question is before us as to the sufficiency of the evidence to support the order removing Mr. Cohn, thereby justifying her action. That is a closed chapter and it has been given consideration only to the extent that it bears upon the question as to whether Mrs. Sherman acted as a reasonable

person placed in her position would have been influenced to act, or whether her action was without reasonable justification and was founded in malice.

This brings us to a consideration of the grounds upon which Mrs. Sherman's letters were revoked. Less than three months after said executors had qualified Mrs. Sherman asked for the cancellation of Mr. Cohn's letters based on the grounds heretofore set out. Two weeks later Mr. Cohn asked for the cancellation of her letters.

On January 2, 1935, Mr. Cohn and Mrs. Sherman entered into a contract whereby it was agreed that Mr. Cohn would continue as business manager of the affairs of Lowell Sherman, deceased, in the same capacity as he had served during his life, at a salary of $75 per week in addition to his statutory fees. He received said compensation as business manager until March 16, 1935, amounting to the sum of $900, on which day the coexecutrix, concluding that there was no necessity for continuing the special employment, discontinued said weekly payments.

We will now consider the principal grounds on which Mrs. Sherman's letters were revoked as they appear in the court's findings. The court found that Cohn presented to Mrs. Sherman the two checks for the sums of $2,670.32 and $3,385.55, respectively, on account of claims presented against the estate by Mr. Cohn personally, which she refused to sign. The allowance of these claims was afterwards withdrawn by the court. Her action in the matter cannot be treated as a ground for removal in the circumstances herein set forth. The court by its findings expressly refrained from commenting on the validity of said claims, as well as the ownership of the other property in the case, for the reason that said disputes could be settled in a proceeding brought in the proper tribunal. It did, however, make a finding that the "court finds that there was no fraud or wrongful practice in the making of said claims or in the presentation thereof by Morry Cohn". If the executor had not committed a fraud upon the estate or was not planning to do so (sec. 521, Probate Code) he should not have been removed, as the crux of the petition and the only grounds alleged for his removal are based upon the alleged fraudulent transactions with reference to his conduct in neglecting to inform the judge, at the time he presented said claims for allowance, of the opposition of his coexecutor

to said allowance, and thereby attempting to induce Mrs. Sherman to sign the checks payable to himself in the belief that the court had, with full knowledge of the situation, directed her to affix her name to said checks. The other transactions which she assigned as causes for removal rest upon like grounds. These grounds, if not sustained, would have left the petition of Mrs. Sherman without a foundation to rest on. It was further found that Morry Cohn was entitled to a continuance of said salary of $75 per week for special services which he continued to render until April 13, 1935.

A finding that Morry Cohn recommended to Mrs. Sherman that she sell a $9,500 note secured by a trust deed and 1500 shares of Transamerica stock in order to have on hand funds with which to pay the expenses of administration, which proposition she disagreed with, is in nowise an impeachment of her business judgment or her fitness to act as an executrix. Before her refusal may be urged as contumaciousness or want of ordinary business judgment more must be shown than appears in the record on that issue. She was more interested in the estate than anyone else and she certainly had a right to disagree with her coexecutor in this as well as in all other matters requiring the exercise of judgment, provided she did not act arbitrarily or wilfully to the detriment of creditors. No serious contention may be made that the estate was ever in a position where the creditors were in doubt as to the payment of their claims or that the estate was at any time sorely pressed by them. The first publication of notice to creditors was made on February 1, 1935, and there was certainly no reason for the exercise of undue haste in the payment of claims during the first six weeks or two months of the administration of the estate. The claim that she refused to allow certain claims and preferred some creditors over others is so lacking in merit as not to require extended consideration. The examination and investigation of the validity of claims cannot be made upon the instant, and certainly the law imposes upon every executor such duty. No unreasonable delay was shown. A sale of the estate's property is not to be made unless a real necessity exists therefor or the estate would be advantaged thereby.

Another ground alleged and found as a fact supporting the petition for removal is based upon the testimony of Roy Hashimoto, a gardner who had been discharged by Mrs. Sher-

man. He testified that Mrs. Sherman told him some time after March that Mr. Cohn was a thief and that she had fired him. Giving full credence to this testimony, it relates to a time after March 27th, and but a few days before Mrs. Sherman actually filed her petition for removal on account of Mr. Cohn's action with respect to the two claims in the circumstances heretofore set forth and because of claims made by him as to his ownership of certain other properties.

It is alleged and found as a ground of removal that Mrs. Sherman had permitted her three dogs to damage expensive rugs and drapes by entering the premises on which she lives. The testimony on this issue was given by Mr. Cohn and is very scant. The examination was conducted by Mr. Cohn's attorney and is as follows:

"Q. Did you have a conversation with Mrs. Sherman in reference to the Chinese rugs at the home at 803 North Bedford Drive? A. I did. Q. What was the conversation? A. I suggested that she send the dogs to a kennel so that they would not ruin the rugs as they were very expensive rugs.

"(By the Court.) Did they ruin the rugs? A. Yes. Q. Can't the rugs be repaired at the present time? A. The spots can't be removed."

The answer that the rugs were ruined was but a conclusion, as well as was the answer that the "spots can't be removed". The witness had no special knowledge on the subject and he should have described what he considered as irreparable damage to the rugs. He named no sum as to the amount of damage done. We assume from the questions and answers that the dogs at times entered the residence. Mrs. Sherman apparently was occupying her son's former premises with no near kin as her companion. As to what household privileges should be accorded to dogs is a matter of personal prerogative which the dog-fancier claims the unhampered right to exercise even though his fancies be not in accord with the opinions of others who believe that dogs should occupy what they term "a dog's place" and be excluded from the luxuriant privileges which are accorded them by a great many fond masters and their families. Dogs are frequently taken into the home to act as guardians of the home in the absence of the elders, or to signal an alarm at the approach of an intruder, even at the risk of causing some occasional inconvenience or damage. We think this issue is dissipated by

a consideration of the common practice which prevails in the larger cities. Besides, the rugs were Mrs. Sherman's property. The title had vested in her.

Mr. Cohn charged in his petition as a ground of removal of his coexecutor a failure on her part to inventory and appraise certain personal effects of the decedent and to report the sum of $600 found in his safe deposit box, as follows: One solid gold dresser set, consisting of eight pieces; one match box, spelling his name, "Lowell", set in diamonds; two solid gold cigarette cases; one cigarette case, gold and tortoise; one crystal and platinum watch; one shirt stud, sapphire and diamonds; one lady's emerald and diamond ring; one silver cigarette box; three volumes of books (Foredge paintings). We understand that since the contests were started all of the above personal effects have been inventoried. This evidence, considered in its relation to the situation of the parties, does not support the above assignment. In the first place, there is no claim that Mrs. Sherman made any attempt to conceal the above or any property of the estate. It is her testimony that the above jewels were kept in a safe deposit box and were delivered to her by Mr. Cohn, who said when he passed them to her that they were trinkets belonging to decedent and it was not "worth while bothering about them". Mr. Cohn knew of the existence of said personal property and it was his duty as much as it was her duty to inventory said articles. There is not the slightest evidence, inferentially or otherwise, to the effect that Mrs. Sherman had a corrupt or dishonest purpose or intent in the matter. Many of the above articles were worn by Lowell Sherman as personal adornments and all, with two or three exceptions, were distinctly such articles as are carried upon the person for useful and ornamental purposes. No doubt she regarded them as personal mementoes of a son's affection for a mother. In a strictly legal sense they were a part of the estate, property which under the will would ultimately have been distributed to her. To hold that the mother attempted to perpetrate a dishonest act or defraud anyone, or misappropriate property of the estate, would be to convict her of a stupid and inane act, lacking in motive, as all of said property would ultimately have been distributed to her and the title then was vested in her. The estate was a valuable one and there was no question

as to its solvency. No one has intimated that she was dishonest.

■ Prior to March 27, 1935, Mrs. Sherman joined with her coexecutor in the allowance of many claims and personally participated in the business of the estate. Mr. Cohn was receiving from Mrs. Sherman, in addition to the fees fixed by law, $75 per week for his services as an inducement to give full time to the transaction of the estate's business. On or about the day last above named his procurement of the allowance of his claims and his asserted claim to the properties above referred to intensified the dispute, and Mrs. Sherman declined to have further personal communication with him. She testified that she had completely lost faith in him for reasons detailed by her, and personal discussions with him were discontinued. Thereafter she communicated with him through her secretary, Milton Cashy, and her personal attorney, Mr. Garbus, who répresented her in the trial court and appeared for her on this appeal. There is no question as to her taking an active interest in the business of the estate and her participation in the transaction of said business through her representatives. The personal relations between the executors having become so acute as to render it advisable to select a reputable person to confer with the other executor in her stead, we are unable to perceive any grounds upon which removal may be predicated by reason of the employment of a competent person to act either as her adviser, or to act in uncontested matters as a medium through which the business of the estate may be transacted, especially in a case where proceedings had been commenced or were about to be commenced by one of the executors to remove the other. It is a common and in many cases a commendable practice for executors to confer with an attorney other than the attorney for the estate, and even with a layman whom the executor may feel has had a wider business experience, or who possesses superior judgment than himself. The business of the estate suffered no detriment by reason of Mrs. Sherman conferring with Mr. Cohn through an intermediary. In fact, the business of the estate had already been temporarily halted by reason of failure of the executors to agree on matters which materially affected the assets of the estate. No complaint can be made as to a want of watchfulness on the part of Mrs.

Sherman as to the affairs of the estate. There can be no question but that the executors mutually assumed conflicting and adverse attitudes towards each other, but such adverse positions cannot constitute sufficient grounds for removal unless founded upon substantial grounds. The question here is whether Mrs. Sherman's conduct was contumacious, arbitrary, or resulted in detriment to the estate.

We think the evidence is not sufficient to sustain a finding based on any of said grounds. We have read the testimony of Mrs. Sherman, as well as the entire record, and she appears to be an intelligent woman capable of administering her son's estate. As a matter of fact the estate is ready to close, with the exception of the determination of the validity of the contested claims and the settlement of disputes existing between said parties as to the ownership of certain real and personal property. We have not included in our discussion all of the items in controversy, but there is no reason why they cannot be or will not be, so far as the estate is concerned, amply safeguarded in the hands of Mrs. Sherman with the aid and advice of a competent attorney. Such claims as are of questionable or doubtful validity should be disallowed and those which have been satisfactorily established should be allowed.

Another reason for the retention of Mrs. Sherman as executrix exists in the fact that the only brief filed in this case for respondent is on behalf of the Citizens' National Trust and Savings Bank of Los Angeles, which institution was appointed special administrator of said estate after the pending appeal herein had been taken. The special administrator in its brief has taken a position supporting the order of removal of Mrs. Sherman and therefore has placed itself in a position adverse to that of the sole heir under the will, which is that Mr. Cohn must establish his claims in the manner provided by law after rejection by the executor. This provision of the statute is by no means oppressive or unreasonable in its requirements.

In conclusion it may be said that the greatest concern of the decedent was his mother's welfare. By his most solemn act he made her his sole heir and appointed her to administer upon his estate. His selection should not be annulled except upon a clear showing that the best interests of the estate

require it.   We are of the opinion that the showing made is not sufficient to justify the cancellation of her letters testamentary.

No other question is decided by our decision herein except the single one which has to do with the order canceling said letters testamentary, and we do not assume to decide any other questions or issues which may hereafter come before the court for decision but which are not involved in this proceeding.

The order and judgment revoking the letters of Julia Louise Sherman as executrix of the estate of Lowell Sherman, deceased, are hereby reversed and she is restored to the office of sole executrix.   Her coexecutor having been removed both by order of court and upon the acceptance of his resignation duly entered, this court is left without jurisdiction to review any order affecting him.   In case any one of several executors to whom letters were granted is removed the remaining executor must proceed to complete the execution of the will.   (Prob. Code, sec. 511.)

Under the provisions of the Probate Code, section 466, the powers of the special administrator automatically cease upon the restoration of the said Julia Louise Sherman as herein directed.

It is so ordered.

Thompson, J., Curtis, J., Langdon, J., Waste, C. J., Conrey, J., and Shenk, J., concurred.