117 Cal.App.3d 915 (1981)
173 Cal. Rptr. 93
Estate of JAMES EFFRON, Deceased.
BANK OF AMERICA, as Executor, etc., Petitioner and Respondent,
v.
CHERYL L. KOSLOW et al., Objectors and Appellants.
Docket No. 22005.
Court of Appeals of California, Fourth District, Division One.
April 10, 1981.
*919 COUNSEL
Gary L. Effron, in pro. per., Hertzberg, Koslow & Franzen and David S. Koslow for Objectors and Appellants.
Gray, Cary, Ames & Frye, R. Reaves Elledge, Jeffrey M. Shohet, William A. Johnson, Jr., Jean Shannon, Rose, Jennings, Squires & Jay and Kendall M. Squires for Petitioner and Respondent.
OPINION
WIENER, J.
Cheryl L. Koslow and Gary L. Effron, beneficiaries of the estate of James Effron, deceased, (Beneficiaries) appeal a probate order denying their application for a citation to remove the Bank of America (Bank) as executor and granting the Bank's petition for preliminary distribution of statutory attorney's fees and executor's commissions.
They challenge on theoretical and practical grounds both customary probate practices fostered by corporate fiduciaries and statutory attorney's fees. On a theoretical level, they claim as a matter of law statutory attorney's fees (Prob. Code, §§ 901; 910, subd. (a))[1] violate the antitrust laws and their application denies due process of law to those affected. As a practical matter, they question the ethical and legal propriety of what they allege to be the customary practice involving reciprocal back scratching between corporate fiduciaries and lawyers in *920 which the lawyer drafting the will is always retained as counsel for the executor. In describing this scenario where the corporation's only purpose is to perpetuate corporate trust and probate business, they claim a conflict of interest is created causing a breach of the executor's duty, reflected here by the Bank's failure to negotiate a lesser fee for its lawyer than that allowed by statute and its failure to discharge counsel when Beneficiaries believed it was in their best interest to do so.
As we will explain, we conclude the system of statutory fees is valid, falling within the state action exemption to the Sherman Antitrust Act enunciated in Parker v. Brown (1943) 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307]. We also decide the Bank did not breach its fiduciary responsibilities. We affirm the order.

Factual and Procedural Background
James Effron died on December 3, 1977.[2] On January 30, 1978, the court admitted his April 1, 1974, will to probate and issued letters testamentary appointing the Bank executor. The Bank, as executor, retained attorneys Rose, Jennings, Squires & Jay. Dustin Rose of that firm knew the deceased and prepared his will.
Beneficiaries objected to the Bank's first account current and petition for payment on account of statutory attorney's fees and executor's commissions and for preliminary distribution filed on October 10, 1978. They claimed the Bank and the Rose firm were not entitled to commissions or fees because the California statutory compensation and fee schedules violated due process of law and were contrary to the antitrust laws. The court found their objections to be without merit and allowed $5,000 on account of commissions and fees to be paid to the Bank and to its attorneys.
In the same proceedings, the court also considered the Beneficiaries' notice of application and application to remove the executor based on grounds similar to those contained in their objections to the preliminary allowance for commissions and fees. The Beneficiaries also argued the *921 executor should be removed because the Bank, concerned solely with its self-interest, failed to negotiate with the Rose firm for an attorney's fee less than that provided by statute. The court rejected Beneficiaries' arguments and refused to cite the executor. (1), (2) (See fn. 3.) This appeal ensued.[3]

Statutory Probate Fees

Parker v. Brown Exemption

(3a) We first consider whether statutory attorney's fees violate federal antitrust laws.
The Sherman Act of 1890, enacted to prevent undue restraints upon trade having a significant effect on competition, provides simply, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is ... illegal." (15 U.S.C. § 1 (1982 pocket supp.) p. 6.) Lawyers can no longer take solace in the naive belief that, as members of a learned profession, they are exempt from the act. "In the modern world it cannot be denied that the activities of lawyers play an important part in commercial intercourse, and that anticompetitive activities by lawyers *922 may exert a restraint on commerce." (Goldfarb v. Virginia State Bar (1975) 421 U.S. 773, 788 [44 L.Ed.2d 572, 585, 95 S.Ct. 2004, 2014].) Although "there may be legal services that have no nexus with interstate commerce and thus are beyond the reach of the Sherman Act" (id., at pp. 785-786 [44 L.Ed.2d at p. 584]), we proceed here on the assumption the fees incurred in probate proceedings, indispensable to the transfer of real and personal property, sufficiently affect commerce to fall within the broad scope of the interstate commerce requirement. (See, e.g., Hospital Bldg. Co. v. Rex Hospital Trustees (1976) 425 U.S. 738, 743-745 [48 L.Ed.2d 338, 343-345, 96 S.Ct. 1848, 1851-1852].)
(4) We also proceed on the premise the setting of fees is a form of price fixing, a practice "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." (Northern Pac. R. Co. v. United States (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514, 518].) The fact that statutory attorney's fees establish a maximum allowance for ordinary services does not alter our premise for "[a]ny combination which tampers with price structures is an unlawful activity." (U.S. v. Socony-Vacuum Oil Co. (1940) 310 U.S. 150, 221 [84 L.Ed. 1129, 1167, 60 S.Ct. 811, 843].) Agreements to fix maximum prices, "no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." (Kiefer-Stewart Co. v. Seagram & Sons (1951) 340 U.S. 211, 213 [95 L.Ed. 219, 223, 71 S.Ct. 259, 260].)
(3b) Within this framework, the applicability of the Sherman Act turns on our determination of whether statutory probate fees fall within the state action exemption of Parker v. Brown, supra.
The Parker court found the California Agricultural Prorate Act, "a program designed to conserve the agricultural resources of the state and to prevent economic waste in the marketing of raisins" (Rice v. Alcoholic Bev. etc. Appeals Bd. (1978) 21 Cal.3d 431, 441 [146 Cal. Rptr. 585, 579 P.2d 476, 96 A.L.R.3d 613]), was exempt from the Sherman Act because the program "derived its authority and its efficacy from the legislative command of the state" (Parker v. Brown, supra, 317 U.S. 341 at p. 350 [87 L.Ed. at p. 326]). The Sherman Act, directed to the regulation of private practices, was not intended to prohibit a state from imposing a restraint as an act of government. (Id., at pp. 350-352 *923 [87 L.Ed. at pp. 325-326].) Since Parker, our high courts have had ample opportunity to dissect this doctrine. (See, e.g., Goldfarb v. Virginia State Bar, supra, 421 U.S. 773; Cantor v. Detroit Edison Co. (1976) 428 U.S. 579 [49 L.Ed.2d 1141, 96 S.Ct. 3110, 3139]; Bates v. State Bar of Arizona (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]; New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co. (1978) 439 U.S. 96 [58 L.Ed.2d 361, 99 S.Ct. 403, 412]; Cal. Retail Liquor Dealers Ass'n v. Midcal Alum. (1980) 445 U.S. 97 [63 L.Ed.2d 233, 100 S.Ct. 937]; and Rice v. Alcoholic Bev. etc. Appeals Bd., supra, 21 Cal.3d 431.)
"These decisions establish two standards for antitrust immunity.... First, the challenged restraint must be `one clearly articulated and affirmatively expressed as state policy'; second, the policy must be `actively supervised' by the State itself. [Citation.]" (Cal. Retail Liquor Dealers Assn. v. Midcal Alum., supra, 445 U.S. 97, 105 [63 L.Ed.2d 233, 243, 100 S.Ct. 937, 943].) "It is clear that no exemption applies if the anticompetitive act is performed by a private association and is not compelled by the state (Goldfarb) or if the state merely approves anticompetitive conduct initiated by a private agency and the program does not effectuate any statewide policy (Cantor)." (Rice v. Alcoholic Bev. etc. Appeals Bd., supra, 21 Cal.3d 431 at p. 444.) In holding that the state action exemption barred application of the Sherman Act to Arizona's restraint on attorney's advertising, the Bates court, at page 362 [53 L.Ed.2d at p. 822], explained, "[t]he disciplinary rules reflect a clear articulation of the State's policy with regard to professional behavior. Moreover, ... the rules are subject to pointed re-examination by the policymaker  the Arizona Supreme Court  in enforcement proceedings. Our concern that federal policy is being unnecessarily and inappropriately subordinated to state policy is reduced in such a situation; we deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active." We proceed then to test sections 901 and 910, subdivision (a), against these standards.

Legislative History
California has had statutory provisions for compensating executors for ordinary services since 1850 when the executor was entitled to receive 15 percent of the first $1,000, 10 percent of the next $9,000 and 6 percent of everything thereafter. The executor also was entitled to receive a further allowance for extraordinary services in an amount determined by the probate judge to be just and reasonable. (Stats. 1850, ch. 129, § 22.) During the balance of the 19th century, the Legislature *924 continued to reexamine that schedule, repealing or amending the relevant section on several occasions. (See Stats. 1851, ch. 124; Stats. 1861, ch. 534 amending § 221; Stats. 1872 amending § 221 to Code Civ. Proc. § 1618; Stats. 1873, 1880, 1881 and 1900 amending § 1618.)
The first statutory authorization of fees for attorneys of executors was contained in Statutes 1905 adding section 1619 to the Code of Civil Procedure and amending section 1618. Attorneys were entitled to receive the same fees as executors and administrators. The court was also permitted to make a further allowance as it found "just and reasonable for any extraordinary service...." Section 1619 of the Code of Civil Procedure is the predecessor of present day section 910, subdivision (a). After sections 1618 and 1619 were amended in 1909 and 1925 (Sen. Bill Nos. 635, 1048, and 392) they were repealed in 1931 and reenacted as sections 901 and 910 of the newly created California Probate Code. Section 910 remained in its 1931 form until 1975 when it was renumbered, without substantive change, to section 910, subdivision (a).
Amendments to section 901 in 1955, 1965 and 1978, are important because any change to section 901 involving executor's commissions automatically changed compensation to their lawyers. Beneficiaries argue the Legislature, unaware of the interrelationship between the two sections, amended section 901 without giving any thought to attorney's fees. Our perusal of the legislative history establishes quite the contrary.[4] As noted below (fn. 4), the Legislature knew exactly what it was doing on each occasion it amended section 901. "Pointed reexamination" *925 of attorney's fees also occurred in those years when legislation was proposed, but defeated.[5]
The Legislature, after expending enormous energy on attorney's fees in probate proceedings, pointedly examining and reexamining the issue in various contexts, has determined the present statutory system of compensating lawyers is both cost effective and fair. Presumably, the *926 public's interest is served where those bereaved are insulated from negotiating over a lawyer's fee during the traumatic postdeath period. Efficiency and economy are present in the use of judicial time which would otherwise be spent verifying fees and trying cases over questions of time, need, and reasonableness of the hourly rate charged. Theoretically, the present system also works in favor of smaller estates, for percentage fees are a financial incentive to lawyers to develop expertise and efficiency in the handling of those estates on a profitable basis, at lower fees than would otherwise be charged, thereby promoting greater access to competent legal services in such matters.
Our State Supreme Court also periodically reviews questions pertaining to the setting of attorneys' fees when it considers and approves State Bar Rules of Professional Conduct. Present rule 2-107 contains the factors which are to be considered in determining the reasonableness of a fee. The rules do not contain any prohibition against a lawyer charging a statutory fee nor do they suggest any ethical impropriety when he does so.
We do not wish to minimize the soundness of many of Beneficiaries' arguments criticizing the present system. One appellate court from another state, in describing legislative changes in probate, has referred to "the public outcry over antiquated and expensive probate laws" criticizing the percentage fee system as unnecessary and expensive. It commended the Legislature for passing a law which authorizes payment to the attorney for the personal representative on a basis of numerous factors, only one of which is the monetary value of the estate. (See Matter of Estate of Painter (1977) 39 Colo. App. 506 [567 P.2d 820, 822].)
The caldron of public dissatisfaction over probate fees, which many view as having been forged through an amalgam of lawyer self-interest and lawyer mistrust, continually bubbles. A recent article in the Washington Post bemoaning a $1,908 hourly fee in a probate matter said, in part, "Percentage fees ... for settling estates ... are generally a rip-off. Some lawyers, to be sure, can't stomach them; but most, ... think they are just dandy. There is little chance that this Legislature [Maryland], or any other, will do anything about this situation this year. But sooner or later lawyers are going to have to accept, or have imposed on them, the revolutionary idea that how much they charge a client should be related to how much work they do." (Quoted in L.A. Daily J. (Mar. 27, 1981) p. 4.)
*927 The fact that others, including legislatures from other states, have different views on the best system for compensating lawyers in probate matters does not mean this court may encroach upon the legislative prerogative where it has been lawfully exercised. We may not substitute our view for a legislative decision which legislators have made after the weighing of the relevant policy considerations. (Drennan v. Security Pac. Nat. Bank (1981) 28 Cal.3d 764, 779 [170 Cal. Rptr. 904, 621 P.2d 1318].) The Beneficiaries' Sherman Act claim is barred by the Parker v. Brown exemption.
(5) We also reject Beneficiaries' claim the Bank's adherence to the statutory procedure and consequent failure to negotiate attorney's fee is private, anticompetitive conduct not mandated by the statute and thus constitutes a violation of the antitrust laws. This factual record, establishing what this Bank's practice is in hiring counsel for executors, is insufficient to establish a form of conspiracy falling within the purview of the Sherman Act.

Schedules Providing for Compensation to Lawyers and Executors Do Not Violate Due Process of Law
(3c) Beneficiaries also say that because the percentage method of calculating attorney's compensation was a legislative response for a method to pay lawyers for their services, statutory fees result in a denial of due process to those persons who wish to question the reasonableness of compensation for services rendered. We trust our discussion of the history of the Probate Code, the power of the Legislature to act, and the rational relationship between the size of an estate and the fees for services rendered, adequately responds to this argument.
Moreover, we also question whether there has been a "taking of property" within the meaning of the due process clause. A "right" of inheritance only exists subject to the control and regulation of the Legislature. (Otto v. Long (1904) 144 Cal. 144 [77 P. 885]; Estate of Bump (1907) 152 Cal. 274 [92 P. 643].) The rights of beneficiaries are subject to the payment out of the estate of expenses of administration and other charges fixed by statute. These requirements do not violate any constitutional right. (6) It is "a constitutional exercise of power for the legislature to provide for definite fees to be awarded to executors...." (Estate of Goodrich (1907) 6 Cal. App. 730, 732 [93 P. 121].) Court approval is required before payment may be made for ordinary *928 services to assure those services were actually rendered. (Estate of Murphy (1916) 171 Cal. 697 [154 P. 839].)

The Bank as Executor Did Not Breach Its Fiduciary Responsibilities
(7a) Beneficiaries say the Bank must be removed as executor because it breached its fiduciary duty when it did not fire the Rose firm upon their request. They claim the proper rule of law is that an executor, upon unanimous demand of an estate's beneficiaries, must discharge the attorneys for the executor, with or without cause, unless the executor will be subjected to some economic liability to third parties arising out of its duties as executor as a result of the discharge. They draw this rule from the following legal principles: (1) The executor stands in a position of trust with respect to the beneficiaries of an estate; (2) the privity of contract rule does not apply in a wills context (see generally, Lucas v. Hamm (1961) 56 Cal.2d 583, 591 [15 Cal. Rptr. 821, 364 P.2d 685] cert. den. (1962) 368 U.S. 987 [7 L.Ed.2d 525, 82 S.Ct. 603]); and (3) a strong public interest exists in favor of a client's right to discharge his attorneys with or without cause. They emphasize here the beneficiaries were the only remaining persons having a genuine stake in the estate.
Beneficiaries correctly recite legal principles affecting the relationship between executors and beneficiaries and the rule giving intended beneficiaries of a will, under certain circumstances, the right to recover as third party beneficiaries. These concepts, however, do not give them the right they assert.
An executor, a person appointed by the deceased to carry out the terms of his will, is charged with the statutory duties of collecting, preserving and protecting the assets of the estate until distribution, subject to the continuing control of the probate court. (§§ 300, 402, 570-588, 7 Witkin, Summary of Cal. Law (8th ed. 1974) Wills and Probate, § 287, p. 5779; Estate of Turino (1970) 8 Cal. App.3d 642, 647 [87 Cal. Rptr. 581]; Estate of Palm (1945) 68 Cal. App.2d 204 [156 P.2d 62].) In the performance of those duties, the executor has the right to retain counsel whose fees for ordinary services, determined by statute, are treated as an expense of administration entitled to priority in payment of the decedent's debts. (§§ 910, 950.) A lawyer acting for an executor has a duty to exercise the highest good faith in the competent performance of his professional responsibilities. (Bus. & Prof. Code, § 6068; Rader v. Thrasher (1962) 57 Cal.2d 244, 250 [18 Cal. Rptr. 736, 368 P.2d 360]; *929 State Bar Rules of Professional Conduct, rule 6-101.) The attorney may not assume a position inconsistent with the interests of the client, not only to prevent the possibility of fraud, but to preclude potential problems involving his being required to choose between conflicting interests. (See 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 55, pp. 62-67; State Bar Rules Prof. Conduct, rules 4-101, 5-101, 5-102, 5-103.)
Generally, the executor's attorney may not represent a beneficiary of an estate in a controversy with other beneficiaries except in those unusual cases where each of the parties expressly consents in writing and the attorney is not professionally hampered by the conflict problem. (See generally; Annot., Estate Attorney Representing Heirs, 47 A.L.R.2d 1104; State Bar Rules Prof. Conduct, rules 5-101, 5-102.) The executor has the absolute right to change attorneys at any stage of the probate proceedings. (Houghton v. Coberly (1962) 201 Cal. App.2d 820, 823 [20 Cal. Rptr. 489]; Estate of McManus (1963) 214 Cal. App.2d 390, 396 [29 Cal. Rptr. 543].)
Seen in this light, the flaws of Beneficiaries' argument become apparent. Their rule would give two persons  a client and a nonclient  the absolute right to discharge the executor's lawyer under any circumstances, creating a confusing exception to the law of tortious interference with business relationships. (See Abrams & Fox, Inc. v. Briney (1974) 39 Cal. App.3d 604, 608 [114 Cal. Rptr. 328]; also 26 A.L.R.3d 679.) There is no policy justification to subordinate the executor's duties and responsibilities in administrating the estate to the controlling power of beneficiaries. The unilateral demand of Beneficiaries for action by an executor cannot be honored unless the merits of that demand coincide with the interests of the court and all others who may have a stake in the efficient administration of the estate. (See, e.g., Estate of Beach (1975) 15 Cal.3d 623, 638 [125 Cal. Rptr. 570, 542 P.2d 994].)
Beneficiaries also argue the executor violated its duty in not discharging the Rose firm when the lawyers of that firm unreasonably delayed the closing of James Effron's temporary conservatorship resulting in unnecessary delay in transferring assets to the probate and in failing to adequately communicate with them. Beneficiaries characterized the Rose firm's behavior as deliberately rude and vexatious.
*930 Beneficiaries have not argued the conduct of the executor or its attorneys falls within section 521, the statutory grounds for removal of an executor. They do not assert any act of waste, embezzlement, mismanagement, fraud, or wrongful neglect. (8) Certainly, however, hostile acts and adverse interest alone may suffice as grounds for removal for the protection of the estate. (See Estate of Withington (1943) 60 Cal. App.2d 105 [140 P.2d 491]; Gross v. Needham (1960) 184 Cal. App.2d 446 [7 Cal. Rptr. 664]; Estate of Guzzetta (1950) 97 Cal. App.2d 169 [217 P.2d 460].) However, the executor's right to administer the estate is generally strong enough to permit him to serve even though his interests may conflict with other persons' interest in the estate. "The test is probably whether the conflict of interest is with the estate itself rather than with other persons who may be interested in the estate." (1 Goddard, Cal. Probate Court Practice, § 574, at p. 523.) The probate court, in examining the facts of a case, must decide whether the circumstances warrant the removal of an executor, and, except for clear abuse, the court's ruling will not be interfered with on appeal. (Estate of Ross (1960) 179 Cal. App.2d 765, 769 [4 Cal. Rptr. 95].)
(7b) We have noted above (see fn. 1, ante) the tragic deaths of James Effron and his wife Essie. Their children were entitled to receive prompt and thoughtful communications from the executor and its lawyers during the difficult period that followed. Their description of the Rose firm's conduct as being callous or outrageous overstates, however, what actually occurred. The objective appraisal by the court of this same conduct and the court's finding there was no basis to cite the executor for refusing to terminate its lawyers on this ground is amply supported by the record.
Beneficiaries argue the Bank's judgment over terminating the Rose firm was colored by its concern not to jeopardize its favorable trust business relationship with that firm. There is no doubt that economic self-interest is a factor which motivates a corporate fiduciary to retain the same lawyer who drafts the will. Nevertheless, where the testator's selection of the executor is free and voluntary, his wish may not be annulled except on a clear showing the best interests of the estate require it. (Estate of Sherman (1936) 5 Cal.2d 730, 744 [56 P.2d 230].) The executor, has the right to choose independent counsel to perform the necessary legal services on behalf of the estate. Presumably, the lawyer with familiarity of the decedent's property is a reasonable choice. Where lawyers' fees are governed by statute and require court approval, *931 the element of the executor's self-interest standing alone does not create an absolute bar to retaining the same lawyer who drafted the will.

Disposition
The order is affirmed.[6]
Staniforth, Acting P.J., and Lord, J.,[*] concurred.
A petition for a rehearing was denied April 29, 1981, and appellants' petition for a hearing by the Supreme Court was denied June 18, 1981. White, J.,[*] participated therein. Bird, C.J., was of the opinion that the petition should be granted.
NOTES
[1] All statutory references are to the Probate Code unless otherwise specified.
[2] Beneficiaries' appellate counsel are decedents' son and son-in-law whose briefs, including reference to documents which we have judicially noticed, tell of the tragic deaths of James Effron and his wife Essie, who were brutally murdered in their downtown San Diego clothing store. In light of their personal suffering, we can empathize with their arguments describing what they, and others, undoubtedly believe to be real inadequacies of our probate system.
[3] In discussing the merits of the appeal, we have rejected respondents' contention that because the allowances were preliminary in nature, the probate order is not subject to review. Section 1240 expressly authorizes an appeal from an order "... settling an account of an executor ... or allowing the payment of [an] ... attorney's fee," the order here.

"One who was properly a party to the hearing of the petition for preliminary distribution ... and who is aggrieved by a judgment adverse to his interest may appeal a judgment of preliminary distribution. [Citations.]" (2 Cal. Decedent Estate Administration (Cont.Ed.Bar 1975) § 32.69, p. 1305.) Had the beneficiaries postponed their appeal, they might well have faced respondents' different, but better argument, that having failed to appeal from the order allowing and approving fees and commissions in the account current, they were barred from raising those matters on an appeal from the order approving the final account. (Estate of Lindauer (1942) 53 Cal. App.2d 160, 165 [127 P.2d 589].)
Section 1240 also provides for appeal from an order or the refusal to make an order "... granting or revoking letters testamentary...." An order denying a petition to remove an executor is appealable because it is, in effect, the same as an order refusing to revoke letters made expressly appealable by section 1240. (Estate of Cuneo (1963) 214 Cal. App.2d 381, 383 [29 Cal. Rptr. 497].) The fact a court does not find sufficient reasons for hearing under section 522 should not deprive an aggrieved beneficiary of his right to appeal. Appellate rights are governed not by the form of an order, but by its legal effect. (Estate of Hart (1953) 119 Cal. App.2d 310, 312 [259 P.2d 703].) The legal effect here of the order refusing to start the process through which the Bank could have been discharged is the equivalent of the appealable order refusing to revoke letters testamentary.
[4] The following excerpts from that history reflect lawyer's fees were an integral part of every legislative change.

In 1955, for example, Legislative Counsel, commenting on Senate Bill No. 320 (Coombs), an amendment seeking to increase section 901 fees said, "The provisions of this bill are applicable to the fees allowable to attorneys for their services for conducting ordinary probate proceedings. (Prob. Code, § 910.)" (Letter to the Legislature of Apr. 14, 1955; italics supplied.) The Judiciary Committee Progress Report in describing Senate Bill No. 320 as part of the legislative program of the State Bar stated, "Under the provisions of Probate Code section 910, the changes made in Probate Code section 901 would be applicable to the regular compensation of attorneys." (Judiciary Com. Progress Rep., p. 51.) In 1965, when section 901 was amended by Assembly Bill No. 170, the author's letter to the Governor included reference to attorney's fees. (Bill Memorandum to Governor Brown, Apr. 22, 1965, in re Assem. Bill No. 170 (Dannemeyer).)
In 1978, Senate Bill No. 1174 was introduced through the efforts of the California Banker's Association to increase the fees for executors for estates over $50,000. The bill was first opposed by Los Angeles County on the basis that reduction in commissions and legal fees would militate against the involvement of the public administrator and county counsel for small estates. In reporting to the Governor, the Legal Affairs Secretary stated. "This bill would raise the statutory fee for all executors as well as all attorneys handling estates." (Enrolled Bill Rep. From Legal Affairs Dept., Sept. 20, 1978.)
Interested and knowledgeable members of the State Bar also made their views known. A former chairman of the bar's probate and trust law committee wrote to the Governor's Legal Affairs Secretary explaining Senate Bill No. 1174 was more properly examined in light of all recent amendments to the Probate Code which had simplified the process and reduced costs. (Letter of Sept. 20, 1978, from Ronald E. Gother.)
Beneficiaries are quite correct in suggesting that those advocating amendments to section 901 were something less than enthusiastic in explaining all the consequences of the proposed legislation. One letter from the California Banker's Association to its legislative representative says, "One problem with California's system of compensating executors is that changes in our fees will automatically increase statutory attorney's fees by virtue of the provisions of section 910 of the Probate Code refering back to the schedule in section 901. Any increase in our commissions will therefore result in a doubling of the increase, which I personally believe is not in the public interest.... If the issue surfaces, however, you should be aware of it, and I am prepared to suggest that attorney's fees in the higher ranges of the schedule should remain the same as they are presently, at least when a corporate executor is acting." (Letter of Mar. 3, 1977, from California Banker's Association to their legislative counsel.) As noted above, the issue did surface and was effectively lobbied. Reference to the various documents included in this opinion were judicially noticed pursuant to Beneficiaries' request. (See Post v. Prati (1979) 90 Cal. App.3d 626, 633-635 [153 Cal. Rptr. 511]; see Comment, The Use of Extrinsic Aids in Determining Legislative Intent in California: The Need for Standardized Criteria (1981) 12 Pacific L.J. 189.)
[5] For example, the efforts to enact the Uniform Probate Code in California are illustrative. The Uniform Probate Code was introduced in 1973 as Senate Bill No. 1; in 1974 as Senate Bill No. 24 (Song). All segments of the legal and financial community responded to those bills. One newspaper headlined the event Probate Code Eyed By State Lawmakers (L.A. Daily J., Nov. 15, 1973.) The journalistic account refers to one law school dean recommending the adoption of all or part of the code. One senator responded by saying reasonable attorney's fees were preferable for no longer would lawyers be able to justify their fees by hiding behind the schedule. Another senator, concerned with lawyer fairness, asked how a widow would be able to negotiate such a fee. "One of the prime protections of the [present] Probate Code is the fact that if you don't have negotiations, the public is generally ... protected. A widow who knows nothing about probate is put in the position of having to rely upon the integrity of an attorney in order to arrive at a fee." (Transcript Sen. Judiciary Com. Hg., Nov. 14, 1973, p. 107.) The dialogue also acknowledged the real possibility that where there was a corporate fiduciary there may be very little legal work. The State Bar's opposition was set out in its 207-page tome, "The Uniform Probate Code: Analysis and Critique, March 1973." Not surprisingly, the legislation was defeated.
[6] Beneficiaries also seek review of an order denying their motion to compel discovery. In light of the discovery conducted and the broad discretion given to the trial court, we find no abuse here. We affirm the order.
[*] Assigned by the Chairperson of the Judicial Council.