143 Cal.App.3d 455 (1983)
191 Cal. Rptr. 897
Estate of JEAN PAUL GETTY, Deceased.
TRUST SERVICES OF AMERICA, INC., et al., Petitioners and Respondents
v.
JOHN K. VAN DE KAMP, as Attorney General, etc., Objector and Appellant.
Docket No. 67351.
Court of Appeals of California, Second District, Division One.
May 31, 1983.
*457 COUNSEL
John K. Van de Kamp, Attorney General, and James M. Cordi, Deputy Attorney General, for Objector and Appellant.
*458 Musick, Peeler & Garrett, Bruce A. Bevan, Jr., Magaram, Riskin, Wayne & Minikes, Morton Minikes, Philip S. Magaram, Richard N. Ellis and Irell & Manella for Petitioners and Respondents.
OPINION
HANSON (Thaxton), J.
The Attorney General of the State of California appeals from orders of the Los Angeles Superior Court sitting in probate approving payment by the estate of Jean Paul Getty of the balance of executors' commissions and attorneys' fees due. The orders are appealable (Prob. Code, § 1240, subds. (k) and (m)) and we affirm them.

FACTUAL BACKGROUND
Jean Paul Getty died in 1976, leaving the largest estate ever subject to probate in the State of California. According to the joint appendix before us (prepared by the parties pursuant to rule 5.1, Cal. Rules of Court, in lieu of a clerk's transcript on appeal), the inventory value of the estate was $760,084,633. The total amount of the estate finally accounted for by the executors was $1,357,877,342.[1] Of this amount, $1.2 billion (approximately) was received by the Getty Museum as the residuary charitable beneficiary of the estate. The increase in value was due in part to gains realized through the sale of Getty Oil Company stock by two public offerings, transactions handled by the executors and attorneys for the estate, which increased the charitable bequest to the Getty Museum by $450 million.
The orders for payment of the balance of commissions and fees as approved by the probate court provided for the payment of $4,332,528 in executors' commissions and an equal amount in attorneys' fees, for a total of $8,665,056. In connection with prior accounts filed by the executors, $9,257,395 had been approved by the court and paid to the executors, and the same amount to their attorneys, for a total of $18,514,790. With the approval of the court of the orders for the balance due the executors and attorneys upon the closing of the estate, the total of executors' commissions and attorneys' fees paid has been $27,179,846.
The estate was involved in a previous appeal (concerning issues unrelated to fees and commissions) which resulted in a published opinion, Estate of Getty (1978) 85 Cal. App.3d 755 [149 Cal. Rptr. 656]. In footnote 4 of that opinion, at *459 pages 760-761,[2] the reviewing court raised the question of whether "the legislative scheme" (i.e., the statutory commission and fee schedule contained in Prob. Code, §§ 901 and 910, respectively)[3] "ever contemplate[d] or visualize[d] an estate of this size, and, if it did not, is there a gap in the statutory rates which the court should fill by fixing reasonable compensation?" The 1978 Getty court, fearing the "windfall" to be realized by the executors and the attorneys for this huge estate in receiving payments for their services at *460 the statutory rates fixed by the Probate Code, invited "the Attorney General to consider, negotiate and take appropriate action" to challenge the application of Probate Code sections 901 and 910 to the Getty estate on behalf of the Getty Museum, the charitable entity over which the Attorney General exercises supervisory and protective powers and responsibilities.[4]
The Attorney General responded to the suggestion in "footnote 4" by objecting to those portions of the executors' "Seventh and Final Account" which provided for payment of the balances set forth above, which brought the total of payments made to the executors and attorneys to the $27 million figure. Taking the position that in considering an estate of this size, the court should depart from the statutory fee schedule and determine the reasonableness of the fees requested, the Attorney General sought the right to conduct discovery to determine the amount of time spent and the nature of the tasks completed by the executors and attorneys charged with responsibility for the estate.
The trial court denied the Attorney General's request for discovery, ruled that he did not have the power to depart from applying the statutory scheme for payment of commissions and fees, had no authority to impose "a standard of reasonableness" in such matters, and approved the final accounting, including the orders of which the Attorney General complained. This appeal followed.

DISCUSSION
(1a) The Attorney General first contends that the probate court was free to depart from the "literal language" of Probate Code sections 901 and 910, and to interpret them "so as to avoid requiring the payment of commissions and fees which so far exceed the reasonable value of services rendered as to create a monumental windfall, unjustly enriching fiduciaries at the expense of the estate, a result which is both absurd and contrary to the statutory purpose to protect estates against excessive commissions and fees."
We disagree with the Attorney General that either the probate court or this court may freely depart from any "legislative design." As was explained in California Teachers Assn. v. San Diego Community College Dist. (1981) 28 *461 Cal.3d 692, 698 [170 Cal. Rptr. 817, 621 P.2d 856], (2) "In construing a statute `we begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law."' [Citations.] `An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' [Citations.] Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. [Citations.] `If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations]."
(1b) We note that Probate Code sections 901 and 910 seem clear, unambiguous and employ the use of the word "shall," long considered to communicate provisions of law in mandatory rather than discretionary terms. (Estate of Downing (1982) 134 Cal. App.3d 256, 272 [184 Cal. Rptr. 511].) Nothing in the two sections suggests that selective application of the schedules contained therein was contemplated by the Legislature, or intended by them, dependent upon the size of the estate involved in probate proceedings. To interpret the sections in any other way, of course, immediately presents the problem of determining at what point an estate qualifies as too large to permit application of the sections.
It is true, as the Attorney General contends, that courts do not apply statutes to situations in a manner which results in absurdity. The Attorney General argues that payment of $27 million for services rendered to an estate which ultimately exceeded $1 billion constitutes an absurd result. The amounts involved here are staggering. However, apparently the testator, accustomed to thinking in such financial terms, did not regard the foreseeable application of California's statutory fee and commission schedule as any more "absurd" than other arrangements; he did require that the executors serve without seeking "any commissions, allowances or further compensations ... claimed to be extraordinary" (Getty composite will, art. 18), thereby wisely removing from probate court the protracted struggles that might have ensued over such matters. In addition, he named two of his sons executors of the will, thereby ensuring that the so-called windfall of statutory commissions would enure primarily to the benefit of persons presumed to be the natural objects of his bounty; such commissions, of course, would also be regarded as deductible expenses of estate administration. The "liquid, one asset" estate required, as the trial judge noted, that the executors and attorneys take the responsibility of deciding when and in what manner two public offerings of Getty Oil Company stock were to be made; as it turned out, the acumen involved resulted in a very substantial increase in the estate's value. Since everything in this world is relative to something else, we cannot say that the results of statutory application in the instant case are absurd.
*462 It is also true, as contended by the Attorney General, that courts seek to avoid "unconscionable" results, i.e., results which lead to oppression. However, we decline to enter into the inevitable philosophical arguments which arise whenever one person amasses a fortune. Here, the beneficiaries of the estate make no claim to oppression, and we find nothing inherently evil or oppressive about the results.
The determinative issue in the case at bench is whether or not the application of the statutory schedules constituted a defeat of the legislative purpose of enacting them, as evidenced by the legislative history of these sections and by pertinent judicial interpretations thereof. We are faced at the outset of this inquiry with the fact that the statutes themselves do not lend themselves to "flexible" interpretation, described so aptly in Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 259 [104 Cal. Rptr. 761, 502 P.2d 1049] as follows: "As we stated nearly a half century ago in In re Haines (1925) 195 Cal. 605, 613 [234 P. 883]: `"The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act."' [¶] Our task then is to determine whether the word `project' is `sufficiently flexible' so as to effectuate the broad legislative intent that private activities should be brought within the ambit of the act. We may not, of course, give an unreasonable construction to the statute." In the case at bench, there appears to be nothing "flexible" about the 1 percent rate "for all [estates] above one million dollars."

LEGISLATIVE HISTORY
We review legislative history of the sections in question, to determine whether their application herein would do violence to legislative intent. Our review leads us to the conclusion that the statutory purpose identified by the Attorney General, i.e., to protect estates against excessive commissions and fees, was but one of a number of statutory purposes envisioned by a series of legislatures. As we shall see, the Legislature has always been concerned with fairness (of which uniformity was perceived as an important component), cost effectiveness, and serving the public interest. We emphasize the importance of uniformity because uniform application of probate procedures has long provided protection against corruption of the system, against favoritism and subjective judgments. We are not persuaded that the multiple legislative purposes would be best served by establishing a precedent for departure from uniformity, which is what the Attorney General suggests in the present case.
We cannot improve on the scholarly discussion contained in Estate of Effron (1981) 117 Cal. App.3d 915, 923-926 [173 Cal. Rptr. 93], concerning the legislative *463 history of the statutory schedules for executors and attorneys in the Probate Code.
"California has had statutory provisions for compensating executors for ordinary services since 1850 when the executor was entitled to receive 15 percent of the first $1,000, 10 percent of the next $9,000, and 6 percent of everything thereafter. The executor also was entitled to receive a further allowance for extraordinary services in an amount determined by the probate judge to be just and reasonable. (Stats. 1850, ch. 129, § 22.) During the balance of the 19th century, the Legislature continued to reexamine that schedule, repealing or amending the relevant section on several occasions....
"The first statutory authorization of fees for attorneys of executors was contained in statutes 1905, adding section 1619 to the Code of Civil Procedure and amending section 1618. Attorneys were entitled to receive the same fees as executors and administrators. The court was also permitted to make a further allowance as it found `just and reasonable for any extraordinary service....' Section 1619 of the Code of Civil Procedure is the predecessor of present day section 910, subdivision (a)....
"Amendments to section 901 in 1955, 1965 and 1978, are important because any change to section 901 involving executor's commissions automatically changed compensation to their lawyers. Beneficiaries [in Effron] argue the Legislature, unaware of the interrelationship between the two sections, amended section 901 without giving any thought to attorney's fees. Our perusal of the legislative history establishes quite the contrary. [Fn. omitted.] As noted below (fn. 4), the Legislature knew exactly what it was doing on each occasion it amended section 901. `Pointed reexamination' of attorney's fees also occurred in those years when legislation was proposed, but defeated. [Fn. omitted.]
"The Legislature, after expending enormous energy on attorney's fees in probate proceedings, pointedly examining and reexamining the issue in various contexts, has determined the present statutory system of compensating lawyers is both cost-effective and fair. Presumably, the public's interest is served where those bereaved are insulated from negotiating over a lawyer's fee during the traumatic postdeath period. Efficiency and economy are present in the use of judicial time which would otherwise be spent verifying fees and trying cases over questions of time, need and reasonableness of the hourly rate charged. Theoretically, the present system also works in favor of smaller estates, for percentage fees are a financial incentive to lawyers to develop expertise and efficiency in the handling of those estates on a profitable basis, at lower fees than would otherwise be charged, thereby promoting greater access to competent legal services in such matters.
*464 "Our State Supreme Court also periodically reviews questions pertaining to the setting of attorneys' fees when it considers and approves State Bar Rules of Professional Conduct. Present rule 2-107 contains the factors which are to be considered in determining the reasonableness of a fee. The rules do not contain any prohibition against a lawyer charging a statutory fee nor do they suggest any ethical impropriety when he does so."
The Effron court was considering a challenge to the statutory schedule based on an antitrust theory, and concluded that the schedules set forth in sections 901 and 910 were constitutional exercises of legislative power, and not subject to the antitrust laws. The court stated that "The fact that others, including legislatures from other states, have different views on the best system for compensating lawyers in probate matters does not mean that this court may encroach upon the legislative prerogative where it has been lawfully exercised. We may not substitute our view for a legislative decision which legislators have made after the weighing of the relevant policy decisions." (117 Cal. App.3d 927.) [Italics added.]
Thus it appears that an active Legislature, amending the pertinent sections over the years, has rejected the idea of basically altering the system set forth therein. The trial court in the instant matter found that the Legislature was aware of the size of the Getty estate and, as a consequence, amended the statute which would have provided approximately $1 million to the state inheritance tax appraiser, but did not take any action to amend sections 901 and 910 to similarly limit the fees in the Getty or any other estate.[5] The Legislature amended Probate Code section 609, relating to inheritance tax fees, in 1976 after the testator herein had died, by enacting Assembly Bill No. 3013, signed into law as an emergency measure on September 12, 1976. In the same legislative session, the Legislature enacted Probate Code section 1025.5, which allows the probate court to reduce the statutory commissions and fees in those estates which are not closed in a timely fashion.[6] No changes were effected in Probate Code sections 901 and 910.
In 1978, the Legislature amended section 901, effective January 1, 1979, so as to increase the statutory fee percentages applicable to executors and attorneys in smaller estates. The Legislature retained the statutory 1 percent for *465 estates over $1 million without placing any limitation upon such fees. (Stats. 1978, ch. 1395, § 1.)
Judicial interpretation of the legislative intent and purpose underlying sections 901 and 910 has been unanimous in perceiving the schedules as mandatory in application, and applicable to all. The suggestion that discretion on the part of the probate judge plays a part in the proceedings, except where the code expressly provides for that, has always been rejected. (3) As was stated in Marina Point, Ltd. v. Wolfson (1982) 30 Cal.3d 721, 734 [180 Cal. Rptr. 496, 640 P.2d 115], "It is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction. Accordingly reenacted portions of the statute are given the same construction they received before the amendment."
(1c) Finally, Assembly Bill No. 905 was introduced in the Legislature in 1980 to have the fees to executors and attorneys in probate matters determined by the probate court on the basis of their being "reasonable." The legislation did not pass. We conclude that the legislative history suggests that the Legislature has long been aware of possible alternatives to the statutory scheme of sections 901 and 910, but has declined to choose them; and further, that the trial court's finding, that the Legislature was aware of the size of the Getty estate but declined to limit the commissions and fees involved, was correct.

JUDICIAL INTERPRETATION
In Estate of Goodrich (1907) 6 Cal. App. 730, 732 [93 P. 121], the court found that the Legislature's enactment of 1905, which included attorneys in the statutory schedule for the first time, was valid, and reflected a desire for uniformity. The Effron court, in 1981, found the statutory schedule "cost effective," "fair" and that it served the public interest.
Review of the case law in the intervening years, between 1907 and 1981, discloses that the courts viewed the sections as mandatory and entitlement pursuant to the schedules absolute. (See, e.g., Estate of Roberts (1945) 27 Cal.2d 70, 76 [162 P.2d 461]; Estate of Skinker (1956) 47 Cal.2d 290 [303 P.2d 745, 62 A.L.R.3d 1137]; Estate of Johnston (1956) 47 Cal.2d 265 [303 P.2d 1]; Estate of Hite (1909) 155 Cal. 448, 453 [101 P. 448]; Estate of Lampman (1940) 15 Cal.2d 212, 215 [100 P.2d 488].)
In Estate of Buchman (1955) 138 Cal. App.2d 228, 235 [291 P.2d 547], the court declared: (4) "[The] [s]tatutory commissions and fees are not gratuities, but are the compensation which the statute gives to the personal representative *466 and to its attorney for all services performed by them in their respective capacities from the commencement of probate proceedings until the estate is wound up and distributed, except [for] those [services] that are remarkable, uncommon or rare. [Citations.] The personal representative and his attorneys are entitled to statutory fees as a matter of right, and the fact that an estate is a simple one and the fees larger than would be adequate compensation for the work involved, does not affect the right to the full statutory compensation. [¶] Conversely, if the estate is more complicated and requires more work, effort and skill than is required in the simple estate, that does not change the nature of services from ordinary to extraordinary. Those undertaking the duties of offices of this character take the bitter with the sweet."

CONCLUSION
(1d) We conclude that the fees and commissions paid the executors and attorneys for this estate do not do violence to legislative intent, as gleaned from legislative history and judicial interpretation, and that the disinclination of the Legislature to intervene in this situation may well have been the result of a reasoned assessment that a potential windfall derived from one estate, no matter how large, did not justify the setting of a dangerous and potentially disruptive precedent in the settling of probate affairs. The goals of uniformity, fairness, cost effectiveness and public service will not, in our view, be jeopardized by affirming the orders approved below. We do so, and it follows that the probate judge's refusal to allow the Attorney General to conduct the type of discovery he sought, with reference to specific tasks and time spent on the part of the Getty executors and attorneys, was proper, in that such evidence is immaterial to the application of Probate Code sections 901 and 910.

THE TIME FORMULA
(5) The Attorney General also urges us to interpret the language in Probate Code section 901 which mandates that executor's commissions be "based upon the total amount of the inventory plus gains over appraisal value on sales, plus receipts, less losses on sales, without reference to encumbrances or other obligations on property in the estate, if any" as allowing the probate court to employ an alternative method of computing commissions and fees (essentially a computational, ministerial act) by use of a time formula. The formula would involve calculating the amount of commissions for each estate asset included in the inventory on the length of time that the proceeds were held by the executor.
The Attorney General concedes that the "customary" construction of Probate Code section 901 in this regard has been "to assume that no matter when an asset is sold during probate the gain on the sale is given the same weight as part of the basis for the fee computation as the original inventory value." He offers *467 no specific authority for employing the alternative method he suggests, but argues that the result would be commissions which bear a reasonable relationship to the executor's responsibility in handling the asset in question.
The formula would apply to sales of estate assets, not to assets held throughout probate. If an asset was sold at a gain, an executor would be entitled to the gain until the closing of probate, or would have to bear responsibility for the loss, as the case might be.[7]
The Attorney General uses the sale of Getty Oil Company stock to demonstrate that application of the formula would have resulted in executor commissions computed on the basis of 33 percent of the $550 million gain, i.e., $183 million, instead of the $550 million, thereby reducing the commissions and fees paid by approximately $3.67 million in each case. As a long-term benefit of such construction, applicable to all estates, the Attorney General contends that probate sales would more likely be made for meritorious reasons, i.e., not for the sole purpose of increasing the executor's commission.
The Attorney General claims that the time formula interpretation is based on the established rule, set forth in Estate of Lampman (1940) 15 Cal.2d 212, 218 [100 P.2d 488], "that the measure of the executor's responsibility is the measure of his compensation." Neither Lampman nor any other probate case, of course, has suggested or used the time formula interpretation fashioned by the Attorney General.
The respondents suggest that such an interpretation would create the need for endless calculations, let alone the amount of gamesmanship it would introduce into probate administration. In the Attorney General's view, "responsibility" is only recognized or rewarded on a sale; respondents point out that "responsibility," for an executor, exists when an inventoried asset fluctuates in value and the executor must decide whether to try to sell it or hold onto it in the opinion or hope that the asset either will increase or at least not go down in value, a decision which should have as little relation to the ultimate commission earned as possible.
*468 Respondents also point out that adoption of such an interpretation would, as in the case of departure from application of the statutory schedules, bring into question the proper treatment of other estate items, such as "receipts."
It is worthy of note that in Estate of Stein (1968) 267 Cal. App.2d 643 [73 Cal. Rptr. 324], the appellate court rejected the premise that any alternative method to the customary manner of applying the statutory percentages to original appraisal value of the total estate was justified or would more accurately reflect legislative intent. We are satisfied that the computation of commissions and fees made in this estate and approved by the probate court proceeded pursuant to the language of Probate Code section 901, as interpreted by judicial decision, and as intended by the Legislature.

DISPOSITION
The orders (judgments) are affirmed.
Spencer, P.J., and Lillie, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied September 22, 1983.
NOTES
[1] Certain trusts were not included in the inventory. We are told that the actual total disposition was of assets of about $1 1/2 billion.
[2] The footnote states, in its entirety:

"The 19th codicil, like earlier codicils, directed that executors and trustees, `shall serve for the statutory commissions provided by the applicable laws of the State of California.' With respect to the compensation of trustees, California law provides only that trustees shall be entitled to a reasonable compensation fixed by the court (Prob. Code, § 1122), but in a trust with a corpus of $700 million even amounts of `reasonable compensation' are bound to be staggering.
"In January 1977, seven months after Getty's death, $3 million was paid to the executors of the Getty estate as partial allowance on statutory commissions of over $7 million, and $2 million was paid to the attorneys for the executors as partial allowance on statutory fees of over $7 million (Prob. Code, §§ 901, 910). The statute specifies amounts of commissions and fees in regressive percentages for estates up to $500,000, and then states a rate of 1 percent `for all above $500,000.' Query: Did the legislative scheme ever contemplate or visualize an estate of this size, and, if it did not, is there a gap in statutory rates which the court should fill by fixing reasonable compensation? (Church of the Holy Trinity v. United States (1892) 143 U.S. 457 [36 L.Ed. 226, 12 S.Ct. 511].) Ordinarily, the museum trustees would be the ones to take action on behalf of the charitable beneficiary to challenge this monumental windfall of commissions and fees to executors and their attorneys for administering what is essentially a liquid, one-asset estate. However, the composition of the museum's board of trustees makes it doubtful that the board could impartially consider this question, let alone take vigorous action, by reason of the conflicts of interest present between the trustees' duties as guardians of a charitable trust and their personal welfare as executors, of the estate, affiliates of attorneys for the estate, and officers and employees of Getty Oil Company. When charitable trustees are unable to act to protect the interests of their beneficiary, the duty to act devolves upon the Attorney General of California. (Gov. Code, §§ 12511, 12591.) We invite the Attorney General to consider, negotiate, and take appropriate action."
[3] Probate Code section 901 provides, in its entirety, as follows: "The executor, when no compensation is provided by the will or he renounces all claim thereto, or the administrator, shall receive commissions upon the amount of estate accounted for by him, as follows: For the first fifteen thousand dollars ($15,000), at the rate of 4 percent; for the next eighty-five thousand dollars ($85,000), at the rate of 3 percent; for the next nine hundred thousand dollars ($900,000), at the rate of 2 percent; and for all above one million dollars ($1,000,000), at the rate of 1 percent. If there are two or more executors or administrators, the compensation shall be apportioned among them by the court according to the services actually rendered by each. [¶] The commission to which the executor or administrator is entitled pursuant to this section shall be based upon the total amount of the inventory plus gains over appraisal value on sales, plus receipts, less losses on sales, without reference to encumbrances or other obligations on property in the estate, if any. This paragraph shall apply whether or not a sale of property has taken place during the probate of the estate."

Probate Code section 910 provides, in its entirety, as follows: "(a) Attorneys for executors and administrators shall be allowed out of the estate, as fees for conducting the ordinary probate proceedings, the same amounts as are allowed by the previous article as commissions to executors and administrators; and such further amount as the court may deem just and reasonable for extraordinary services. [¶] (b) Attorneys may charge a reasonable fee in representing the person filing a petition under Section 650, subject to approval by the court."
Pursuant to the Getty will, the attorneys representing the estate were limited to statutory fees only and waived the right to seek extraordinary fees as allowed by Probate Code section 910, subdivision (a). Consequently, no extraordinary fees were sought, approved or paid.
[4] During the proceeding below, the probate court determined that the Attorney General was properly before the court as an objector, that the Attorney General had sufficient standing to challenge the orders made.

After the published opinion in Estate of Getty, supra, 85 Cal. App.3d 755, we are told that the trustees of the Getty Museum hired independent counsel to determine whether there was any basis for action by the trustees along the lines suggested in "footnote 4," i.e., challenging the application of the statutory schedules set out in sections 901 and 910 of the Probate Code to the estate. Independent counsel found none. Consequently, the trustees were not actively involved in the probate proceeding below concerning the Attorney General's objection to the final accounting, and are not parties to this appeal.
[5] The Attorney General conceded below that the Legislature was aware of the Getty estate in amending Probate Code section 609 but argues that this does not establish legislative intent concerning sections 901 and 910. As amended, section 609 now provides a maximum fee of $10,000, regardless of estate size; "Upon application of the referee, the court may allow a fee in excess of the maximum ... if the court determines that the reasonable value of the referee's services exceeds such amount." (The 1976 amendment may be found in Stats. 1976, ch. 885, § 1. The 1982 amendment may be found in Stats. 1982, ch. 1535, § 7.)
[6] In the case of unjustified delay, "the court may, notwithstanding the provisions of sections 901 and 910, reduce the fees or commissions...."
[7] T=length the estate is open
T1=length of time the asset is held
The gain or loss would be multiplied by T1
 ____
 T

Applying this formula to the Getty estate, the estate was open six years, and the asset (stock) was sold approximately two years before the end of probate. Thus:
 T1 = 2 and 2 x $550 million = $183 million
 __ _ _
 6 6
The 1 percent would be applied to the $183 million figure, instead of the $550 million.