[No. B084575. Second Dist., Div. Seven. Apr. 23, 1996.]

Estate of CONRAD NICHOLSON HILTON, Deceased.
MYRON E. HARPOLE et al., Petitioners and Appellants, v.
CONRAD N. HILTON FOUNDATION, Objector and Appellant;
DANIEL E. LUNGREN, as Attorney General, etc., Objector and
Respondent.

## Counsel

Darling, Hall & Rae, Matthew S. Rae, Jr., Robert E. Willard, Esner, Zakheim, Higa & Chang, Billie Ann U. Higa and Stuart B. Esner for Petitioners and Appellants.

Loeb & Loeb, Andrew S. Garb, David C. Nelson, Oberstein, Doniger, Fetter, Kibre & Horwitz, Oberstein, Kibre & Horwitz and Henry Pollard for Objector and Appellant.

Daniel E. Lungren, Attorney General, and Chester H. Horn, Deputy Attorney General, for Objector and Respondent.

## Opinion

GOLD, J.*—In proceedings for the probate of a decedent's estate in California, the compensation of the personal representative[1] and the compensation of the personal representative's attorney[2] are each fixed through the use of two quite different approaches. To begin with, in every case the personal representative and his or her attorney are entitled to compensation

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1] The probate court appoints a person or firm (called a "personal representative") to administer the probate of a decedent's estate. That person or firm ordinarily is (a) an "executor" named as such in the decedent's will, (b) a successor to that executor, called an "administrator-with-the-will-annexed," or (c) an "administrator" where the decedent died without a will naming an executor. Anyone having one of these three capacities is sometimes referred to as a "general personal representative" because such a person or firm automatically has broad powers. However, when there is no general personal representative for an estate (typically because none has yet been appointed or because of the death, resignation or removal of the person theretofore appointed), the probate court may appoint a person or firm with limited powers (limited to those specifically authorized by the court) to administer the estate; such a person or firm is called a "special administrator." In a decedent's estate proceeding the term "personal representative" can include any of the aforementioned appointees. Where a woman is the personal representative, she is often referred to as an "executrix" or by using the word "administratrix" in place of the word "administrator" in titles other than "executor."

[2] The statutes contemplate using the same approaches in calculating the compensation of the personal representative's attorney (which compensation is called "fees") as are used in calculating the compensation of the personal representative (which compensation is called "commissions"). (See Probate Code sections 10800, 10801, 10810 and 10811.)

based upon a sliding scale of percentages of the value of the estate accounted for.[3] (Prob. Code, §§ 10800, 10810.)[4] Because this compensation is intended as payment for the services which are involved in substantially every probate case, it is commonly known as "statutory" or "ordinary" compensation or as compensation for "statutory" or "ordinary" services. The second approach provides for compensation for services which are not involved in the typical probate case, and that approach authorizes the court to allow additional compensation for those unusual services—so-called "extraordinary" services.[5] Sections 10801 (as to personal representatives) and 10811 (as to their attorneys) provide that the probate court "may allow additional compensation for extraordinary services . . . in an amount the court determines is just and reasonable." Compensation determined by this second approach is commonly known as "extraordinary" compensation or as compensation for "extraordinary" services.

This case involves the following two questions concerning compensation for the personal representative's attorney, at least the first of which has not heretofore been addressed by a reported California case:

1. If at a later date the amount of an earlier partial statutory fee award in a proceeding for probate of a decedent's estate seems excessive, does the court have the power to require repayment of the excess?

2. In considering whether to award attorney fees for extraordinary services and the amount of any such fees to be awarded, what is the significance of prior awards of statutory and extraordinary fees from which no appeal was taken?

## I. THE APPEALS

Myron E. Harpole (Myron) and the Law Offices of Witter and Harpole (the Harpole law firm) appeal from an order denying their petition for attorney fees for extraordinary services rendered to the personal representatives of the Estate of Conrad Nicholson Hilton, Deceased (the Estate). Myron and the Harpole law firm are hereinafter collectively referred to as "Harpole."

---

[3]The term "value of the estate accounted for" has a highly technical definition, a discussion of which is unnecessary for purposes of this case.

[4]In California, for some no doubt interesting historical reasons, over the years the sliding scale for personal representatives' attorneys has always been identical to that for personal representatives. Unless otherwise indicated, all statutory references herein are to the Probate Code.

[5]"Extraordinary" services may include services in connection with such matters as litigation with third parties, federal estate tax matters, sales of property, etc. Again, the term "extraordinary services" has a highly technical definition, a discussion of which is unnecessary for purposes of this case.

The Conrad N. Hilton Foundation (the Foundation) cross-appeals from the same order, but only to the extent that it denies the Foundation's request that Harpole be ordered to repay to the Estate a portion of the statutory attorney fees Harpole has already been awarded and paid from the Estate.

The challenged order is appealable. (§ 7240, subd. (*l*).)

## II. THE BACKGROUND

### A. *Retention of Harpole as Attorney*

Multimillionaire Conrad Nicholson Hilton (Conrad) died testate on January 3, 1979, leaving the bulk of his estate to the Foundation. On eventual settlement, the Foundation received assets valued somewhere between $406 million and $744 million.[6]

In his will, Conrad designated his attorney and friend James E. Bates (Bates) to serve as co-executor along with Conrad's son William Barron Hilton (Barron). In January of 1979 Bates retained Harpole to represent the prospective co-executors concerning all tax matters.

On March 13, 1979, before admission of Conrad's will to probate, Conrad's daughter Constance Francesca Hilton (Francesca) filed a contest of that will. As a result of this will contest, there was a period of special administration before the will was admitted to probate. Bates and Barron were appointed special administrators, and they retained the Harpole law firm as their counsel during the period of special administration. In May of 1980 the court dismissed Francesca's will contest following a successful motion for summary judgment by the special administrators. Conrad's will was admitted to probate on May 14, 1980, and Bates and Barron were appointed co-executors.

In April 1983 Barron's powers as co-executor were suspended at his request pending the determination of the so-called "Barron's Option" matters,[7] in which Barron's position was adverse to the residuary beneficiaries of the Estate. On February 28, 1989, Barron was reinstated as co-executor.

---

[6]At one point, the Office of the California Attorney General, acting in its capacity as supervisor of charitable trusts in California, stated (with respect to a dispute arising over the Hilton Hotels Corporation stock owned by the Estate) that "the amount at issue for charity in this case is the largest of any case known to us."

[7]Conrad's will granted Barron an option under certain circumstances to purchase a described portion of the assets of the Estate "at the values as appraised in [Conrad's] estate." Barron exercised that option and by virtue of that exercise claimed the right to purchase the Estate's control block of Hilton Hotels Corporation stock at a bargain price (the stock's value

On May 23, 1990, Bates died. On June 8, 1990, Wells Fargo Bank was appointed as successor co-executor in place of Bates; and Barron and Wells Fargo Bank thereafter acted as co-executors. At least during the period while Bates was alive and again after Wells Fargo Bank became a successor co-executor, Harpole continued to render extraordinary services for the Estate.

As of January 13, 1992 (the date when Harpole filed the fee petition which is the subject of this appeal), the administration of the Estate still had not closed.

### B. *Prior fee awards*

1. *The $1,042,383.30 Statutory Fee Award in 1980*:

On December 17, 1979, Bates and Barron filed their "First Account Current and Report of Special Administrators; and Petition for . . . (4) Allowance on Account of Statutory Compensation." In that account, report and petition as supplemented on January 7, 1980, Bates and Barron alleged that as of December 21, 1979, the base upon which statutory compensation would be calculated was $207,341,660.01 and that statutory compensation calculated on that base would amount to $2,084,566.60. Bates and Barron requested that an allowance of 50 percent of that amount, namely $1,042,283.30, be made to them "on account of statutory compensation" and that an allowance of $1,042,383.30 be made to the Harpole law firm. On January 14, 1980 the probate court settled and approved the account and report and, among other things, ordered that the requested $1,042,383.30 "be allowed on account of statutory compensation to Witter and Harpole, attorneys for the Special Administrators."

2. *The $440,269.93 Statutory Fee Award in 1980*:

On July 24, 1980, Bates and Barron filed their "Second and Final Account and Report of Special Administrators; and Petition for . . . (3) Allowance on Account of Statutory Compensation." That account and report covered the period from December 22, 1979, to May 21, 1980. In that petition Bates and Barron alleged that the base upon which statutory compensation would be calculated was $210,692,599.20 and that statutory compensation calculated on that base would amount to $2,118,075. Bates and Barron requested that an allowance of 70 percent of that amount, namely $1,482,653.10, less

had risen dramatically over its date-of-death value), paying for it by giving a no-down-payment unsecured 10-year installment note. A portion of that litigation is the subject of our decision reported as *Estate of Hilton* (1988) 199 Cal.App.3d 1145 [245 Cal.Rptr. 491].

the $1,042,383.30 previously allowed, for a net of "$440,269.83" (*sic*), be made to them "on account of statutory compensation" and that a like allowance be made to the Harpole law firm. The petition alleged that 70 percent of the statutory compensation was "a reasonable portion of the compensation to be allowed for services rendered to the estate to this date" and that the requested allowances "can be made without harm to the estate or any person interested in it." On August 15, 1980, the probate court approved that account and report and, among other things, ordered that the requested $440,269.83 "be allowed on account of statutory compensation to WITTER AND HARPOLE, attorneys for the Special Administrators." This brought to $1,482,653.13 the total amount of statutory attorney fees awarded on account of services to the special administrators.

### 3. *The $325,000 Extraordinary Fee Award in 1984:*

On June 20, 1984, the probate court awarded Myron $325,000 compensation for extraordinary services to the special administrators, namely, those rendered in the successful defense of Francesca's will contest.

### 4. *The $48,470 Extraordinary Fee Award in 1989:*

On March 1, 1989, the probate court awarded the Harpole law firm $48,870 for extraordinary "services rendered from March 8, 1988 to June 24, 1988 in connection with reviews of the hearing and decision of the District Court of Appeal in this matter." The decision referred to in the March 1, 1989, order is our March 28, 1988, decision cited in footnote 7, *ante.*

### C. *The Present Fee Petition and the Objections Thereto*

On November 12, 1991, the Foundation and the California Attorney General filed a petition seeking to compel a final accounting and final distribution. On December 13, 1991, the probate court ordered that "[a]ll current and former personal representatives of the Estate and their attorneys that wish to request an award of statutory and/or extraordinary compensation shall file petitions therefor on or before January 13, 1992."

On January 13, 1992, Harpole filed a petition seeking $2,550,000 for extraordinary services rendered to the Estate from January of 1979, expressly excluding those extraordinary services for which he had already received compensation. The Foundation and the Attorney General filed objections to that petition.

At some point thereafter the Foundation requested the probate court to order Harpole to repay to the Estate a portion of the statutory fees theretofore allowed and paid to Harpole by the Estate, together with interest thereon.[8]

Pursuant to stipulation and order thereon, Honorable Lester E. Olson, retired judge of the Superior Court for the County of Los Angeles, conducted the trial on Harpole's petition as supplemented and the amended objections thereto. Following the conclusion of the trial and various posttrial proceedings, on March 31, 1994, Judge Olson issued his order denying Harpole's $2,550,000 fee request in its entirety and refusing to order Harpole to repay anything to the Estate. This appeal and cross-appeal followed.

III. DISCUSSION

Because the outcome of the question of whether Harpole can be required to repay any of the fees heretofore awarded obviously may have an impact on the appropriateness of the trial court's determination that Harpole should not be paid *more* fees, we shall consider the "power to order repayment" question first.

A. *Did the trial court have the power to order repayment of any of the statutory fees previously awarded Harpole?*

1. *The Foundation's Contentions*:

The Foundation asked the trial court to order Harpole to repay to the Estate at least $319,653.13 of the statutory fees Harpole had theretofore been paid, reasoning as follows:

1. The trial court found that the reasonable value of Harpole's statutory services was no more than $263,000.

2. The trial court found that the reasonable value of Harpole's extraordinary services not covered by the 1984 and 1989 awards was no more than $900,000.

3. Harpole was awarded an aggregate of $1,482,653.13 in statutory fees.

---

[8]The Foundation has not cited us to any formal pleading by which this request was made. However, the request was contained in the trial brief of the Foundation and the Attorney General, and it was briefed and argued by both sides before the trial judge and before us without any contention being made that the matter was not properly raised before the trial court; and we shall treat those facts as a concession by both sides that the trial court had the power to rule upon the request.

4. Therefore, Harpole has been overpaid by at least $319,653.13 ($1,482,653.13, less the $263,000 and less the $900,000).

The Foundation bolstered its contention that a repayment from Harpole was mandatory by noting that by the 1992 time of filing of Harpole's final fee petition, the Probate Code's schedule of statutory fees (currently found in § 10810) had been amended so that the statutory fees on a $210,692,599.20 fee base (the one asserted in the 1980 final account of the special administrators) would no longer be the precise amount of $2,118,075, but instead would be $186,150 plus "a reasonable amount to be determined by the court" for all of the value of the estate accounted for above $25 million.[9]

The Foundation contended that partial awards of statutory fees are adjustable when the precise final base for calculating statutory fees (and therefore the precise amount of statutory fees) is determined—typically, as here, not until the conclusion of the estate administration.

## 2. *The Trial Court's Decision*:

The trial court denied the Foundation's request that Harpole be ordered to repay some of the statutory fees Harpole had theretofore been paid. The trial court's reasoning was as follows:

". . . [Harpole] received [the sums awarded by way of statutory fees and extraordinary fees] pursuant to valid orders of this court that were appealable, and which have become final. To require [Harpole] to affirmatively refund any part of said funds would violate due process of law, and the Hilton Foundation has directed the court's attention to no statute or decision that would support such draconian relief.

". . . By hindsight, the court, in 1980, should have 'held back' more of the allowance of statutory fees ordered paid on account than it did. It had the authority to do so, but erred in not doing so. Such error cannot now be corrected—the pigeon has flown the coop."

---

[9]Effective in 1987, no doubt in response to *Estate of Getty* (1983) 143 Cal.App.3d 455 [191 Cal.Rptr. 897, 40 A.L.R.4th 175], in which the Court of Appeal held that $9,257,395 in statutory attorney fees was mandated by statute, the Legislature modified the schedule of statutory fees to (a) lower from 1 percent to ½ percent the statutory fee on that portion of the fee base between $10 million and $25 million, and (b) change the statutory fee on that portion of the fee base in excess of $25 million from 1 percent to "a reasonable amount to be determined by the court."

3. *Analysis*:

*No appeal was taken from the prior orders*:

Our analysis of this issue begins with the fact that all of the prior fee awards to Harpole were appealable. On the occasions when each of the prior fee awards to Harpole were made, section 1240 (now subd. (*l*) of § 7240) permitted an appeal to be taken from an order "[d]irecting or allowing the payment of a[n] . . . attorney's fee . . . ."

From the fact that the orders were appealable and no appeal was taken from any of them, Harpole argues that the orders became "final," and that they therefore are not subject to modification at some later date when the precise fee base is finally known. We find that argument overly simplistic. ■ It is true that the failure to challenge the prior fee orders by appeal when they were made prevents anyone from asserting that the special administrators and executor[s] were wrong to have paid the amounts allowed at the times when the orders therefor were made, or that Harpole was wrong to have taken the sums allowed at the times when the orders therefor were made. (But see *Estate of Hart* (1959) 51 Cal.2d 819 [337 P.2d 73], discussed at length below.) However, the "finality" of those orders does not necessarily mean that there can be no recalculation (and order for repayment) upon final determination of the precise fee base. The answer to the question of whether there can be requires closer scrutiny of the statutes and cases and the policies underlying them.

Prior to 1911, California law did not provide for interim allowances toward the compensation of the personal representative of a decedent's estate or toward the compensation of that representative's attorney. (*Estate of Hite* (1909) 155 Cal. 448, 458-459 [101 P. 448].) In 1911 former section 1616 of the Code of Civil Procedure (now Prob. Code, § 10830) was amended, expressly authorizing the probate court, upon a petition filed at any time after issuance of letters to the personal representative,[10] to grant such an allowance of fees to the attorney for the personal representative "on account of services rendered" up to that time. (See *Estate of Windiate* (1961) 197 Cal.App.2d 560, 565 [17 Cal.Rptr. 297] [1911 amendment enabled probate court to apportion statutory fees among successive attorneys "according to the services actually rendered by each"].) When each of the fee awards to Harpole herein was made, the then-current version of this statutory provision was contained in section 911.

---

[10]The current version of the statute (§ 10830) permits a petition for a partial allowance toward statutory fees to be filed only after four months has elapsed from the issuance of letters.

*The Hart case*:

In contending that the trial court herein erred in concluding that it was powerless to order Harpole to repay some of what had already been ordered paid, the Foundation relies heavily on *Estate of Hart, supra*, 51 Cal.2d 819. In *Hart* a $250 partial allowance toward statutory attorney fees had been ordered in 1953 and was partially paid in 1956 by the administratrix-with-the-will-annexed (administratrix) of the Irene Hart Estate. In 1957 that administratrix filed her second account and sought to credit herself with what she had paid toward the $250 attorney fee order. In the meantime, in 1956 the administrator of Irene's surviving spouse Augustus (Augustus had died eight days after Irene) obtained a judgment decreeing that all of the property in Irene's estate (except for government bonds with a maturity value of $225) belonged to Augustus's estate instead. Augustus's administrator objected to Irene's administratrix claiming credit for the sums paid toward the $250 fee order, arguing that because statutory fees are to be based upon "the amount of the estate accounted for" and the amount of Irene's estate accounted for turned out to be virtually nothing ($225), it was improper to credit Irene's administratrix with payment of statutory fees that turned out to be excessive. Upon hearing the second account, the trial court purported to reexamine the $250 statutory fee allowance and to reapprove it. The Supreme Court reversed, holding that "it was error to allow . . . fees based on assets not a part of the estate." (51 Cal.2d at 826.)

We do not believe that *Hart* is determinative of the issue presented here. It differs from the case at bar in at least four significant particulars:

1. So far as can be discerned from the *Hart* opinion, the issue of the res judicata effect of the 1953 $250 fee award was neither argued to nor considered by the Supreme Court.

2. In *Hart* the issue of the propriety of the 1953 fee award was re-examined by the trial court upon the 1957 second account, and the Supreme Court's opinion does not reflect that the administratrix's attorney objected to that reexamination. Furthermore, the trial court's order in *Hart* expressly reapproved the 1953 $250 fee order. These facts arguably opened the door to consideration of the propriety of the 1953 fee order on appeal from the 1957 order. In the case at bar Harpole vigorously objected to any reexamination of the prior fee orders, and the trial court's order herein neither approves nor disapproves them.

3. In *Hart* any need for recalculation of the prior fee award arose out of the diminution of the size of the "estate accounted for" to such an extent that

as a matter of law the prior fee award exceeded the total statutory fee allowable. In the case at bar there can be no suggestion that as a matter of law the prior statutory fee awards in the aggregate exceeded the total statutory fee allowable. As noted above, under the current statutory formula the trial court was empowered to award Harpole a reasonable fee for that amount (approximately $185 million) by which the estate accounted for exceeded $25 million. And under the statutory formula in effect at the time the partial statutory fee awards to Harpole were made, at the time of the proceedings before Judge Olson the fee base was such that approximately 30 percent of the statutory fees remained unpaid. At most, *Hart* stands for the proposition that when the partial allowances turn out to exceed the total amount allowable, the court may revisit the partial allowances.[11]

4. A significant part of the motivation for the Supreme Court permitting the prior allowances to be revisited in *Hart* was a problem as to whether Augustus' administrator had *standing* to challenge the 1953 fee award when it was made. While noting that in 1953 Augustus's administrator may have been entitled to relief from a court of *equity* preventing the dissipation in Irene's estate of the assets he claimed for Augustus's estate, the Supreme Court also noted that at the time of the 1953 proceedings Augustus's administrator had no standing to object in *probate* court to the $250 partial allowance of statutory fees because he was then not yet a "person interested in" Irene's estate, and then section 927 only permitted objections by persons "interested in the estate." (*Estate of Hart, supra,* 51 Cal.2d at 823.)[12] Because in 1953 the administrator of Augustus's estate was not yet a "person interested in" Irene's estate, the Supreme Court relied upon *Estate of Dabney*

---

[11]In fact, the following statement appears in *Hart,* suggesting that but for the change in the *base* upon which statutory commissions were initially allowed, the probate court would have been powerless to revisit the statutory prior fee order: "The court in the second account purported to re-examine those allowances [of expense, fees and commissions in the order settling the first account] and to reapprove them, *and it might be deemed that those items, if rightfully allowed, were binding on the appellant as proper in the second account.* However, the allowance of $250 as administratrix' fees and a like amount for attorney's fees . . . cannot be deemed to have been properly made. Such fees and commissions are governed by statute and are based upon the 'amount of the estate accounted for.' The amount of the estate finally accounted for . . . was, for all practical purposes, nothing, and it was error to allow commissions and fees based on assets not a part of the estate." (51 Cal.2d at 826, italics added.)

[12]Under the statutory expansion of the jurisdiction of the probate court effected in 1972 and 1989, Augustus's administrator might well have standing to object to a partial allowance of statutory fees if the 1953 proceedings had taken place today. (See § 800 ["The court in proceedings under this code is a court of general jurisdiction . . . ."]; 1 Cal. Civil Practice: Probate & Trust Proceedings (Bancroft-Whitney 1993) Probate Jurisdiction and Procedure, § 5:1, p. 5 [impact on prior case law of expansion of jurisdiction of probate court]; Ross & Moore, Cal. Practice Guide: Probate (The Rutter Group 1993) §§ 3:60.6 to 3.60.12, pp. 3-21 to 3-23 [probate court may now exercise powers of a court of equity concerning controversies involving the administration of a decedent's estate]; § 48, eff. Jan. 1, 1985, broadly defining

(1951) 37 Cal.2d 672 [234 P.2d 962] and *Texas Co.* v. *Bank of America* (1935) 5 Cal.2d 35, 46 [53 P.2d 127], in concluding that Augustus's administrator could not have contested the 1953 proceedings in Irene's estate and therefore "was not bound by the [1953] order . . . allowing attorney's fees . . . ." (*Estate of Hart, supra,* 51 Cal.2d at p. 824.)[13] In the case at bar the Foundation of course was a "person interested in the estate" at all times when Harpole was awarded fees and therefore was bound by those fee orders, whatever their effect may have been.

Accordingly, for all of the foregoing four reasons, *Hart* is not dispositive of the issue of the trial court's power to order Harpole to disgorge fees previously allowed.

### The "on account of" language:

The Foundation next asserts that the modifiability of partial allowances of statutory attorney fees is demonstrated by the fact that the statute authorizing such allowances (then § 911, presently § 10830) provides that they are allowances "on account." Harpole replies by noting that they are allowances "on account *of services rendered up to that time.*" (Italics Harpole's.)[14] Neither side's contention seems dispositive. All that the language in question necessarily denotes is (a) that the allowance is not of the full and final amount, and (b) that the allowance is to take into account only the services rendered up to the time of the allowance.

### The Hite case:

The Foundation asserts the axiomatic proposition that the amount of the statutory compensation cannot be determined conclusively until the final account is filed, citing authorities such as *Estate of Hite, supra,* 155 Cal. 448, and the statutory compensation statutes in their various forms over the years.

---

"interested persons"; § 9860, added in 1972 by amendment to then § 851.5; Ross & Moore, *op. cit. supra,* §§ 15:337 to 15:342, pp. 15-80 to 15-81.)

[13]This reasoning does not appear to have considered the fact that the probate court has in rem jurisdiction (see, e.g., *Estate of Parsons* (1925) 196 Cal. 294, 299 [237 P. 744]; *Abels* v. *Frey* (1932) 126 Cal.App. 48, 53-54 [14 P.2d 594]) and that its final orders often have preclusionary effect on the claims and contentions of others—even others who did not have standing to litigate those claims or raise those contentions at the time the proceedings resulting in the final order took place. But it is not necessary (or appropriate) for us to second-guess the Supreme Court in *Hart. Hart's* precedential value merely should be limited to cases involving the same circumstances. As noted in the body of this opinion, the case at bar involves circumstances quite different from those involved in *Hart.*

[14]The Foundation notes appropriately that the probate court could hardly have intended either of the interim awards of statutory fees as precise compensation for the services rendered up to that time because the petitions for those awards did not describe the statutory services performed up to that time.

However, it does not logically follow from that proposition that interim statutory compensation orders are retroactively modifiable. It would be just as logical to conclude that such orders are nonmodifiable and that it is left to the probate court to protect those interested in the estate by making only conservative interim allowances.

*The Heck case*:

On the surface, *Estate of Heck* (1958) 160 Cal.App.2d 162 [324 P.2d 733], seems quite instructive on the issue here under consideration. In *Heck* the decedent died in 1952 and her will was admitted to probate later that year. Effective in 1955 the Legislature *increased* the statutory compensation rates. Prior to that increase becoming effective, there were two partial statutory compensation awards. After 1955, upon settling the executor's final account, the probate court used the old, lower rates to calculate the statutory compensation allowed the executor and his attorney. The Court of Appeal reversed, holding that the new rates should have been used and citing *Hite, supra*, So, argues the Foundation, if the new rates should have been used in *Heck*, they should be used in the case at bar and using them requires a repayment by Harpole.

We disagree, for at least two reasons:

1. Unlike the case at bar, *Heck* did not involve a party attempting to *set aside a prior order* for compensation. The attempt to use the lower compensation rates was only an attempt to use them prospectively for purposes of computing the final statutory compensation, from which the earlier partial awards were to be deducted. If Harpole had sought additional statutory compensation in 1992, *Heck* might have governed that request; but *Heck* is not persuasive authority that old partial statutory compensation awards are exposed to retroactive modification in the event that the Legislature modifies the statutory compensation rates.

*Heck* relied heavily upon the proposition that the statutory compensation of the personal representative and the representative's attorney should be based upon the rates in effect at the time of the settlement of the account and the making of the order allowing compensation, citing *Estate of Lucksinger* (1956) 47 Cal.2d 396 [303 P.2d 1016] and *Estate of Johnston* (1956) 47 Cal.2d 265, 270 [303 P.2d 1]. This proposition is not inconsistent with the notion that Harpole's prior statutory fee orders (each of which was made in conjunction with an order settling an account) are to be based on the rates in effect at the time those prior fee orders were made.

2. Unlike the case at bar, *Heck* involved an upward modification of the statutory compensation schedule. There are different policy considerations

involved in retroactively decreasing old partial compensation awards than are involved in retroactively increasing them. (See, e.g., fn. 16, *post.*)

*The "retroactivity" or "substantive, not procedural" argument:*

The Foundation contends that independent of the *Heck* case, this court should conclude that the 1987 modification of the statutory compensation rates operates retroactively and therefore that Harpole's past statutory fee awards should be retroactively modifiable.

■ A change in law which deprives a person of a vested right or substantially impairs such a right is invalid to the extent that it purports to be retroactive, because it denies the holder of that right due process. (E.g., *Roberts* v. *Wehmeyer* (1923) 191 Cal. 601, 605-606, 612 [218 P. 22].) However, that rule does not apply to mere "procedural" rather than "substantive" changes. (E.g., *City of Los Angeles* v. *Oliver* (1929) 102 Cal.App. 299, 315 [283 P. 298].) Accordingly, in evaluating the Foundation's "retroactivity" argument, a threshold question is whether the 1987 modification of the statutory compensation rates was a substantive or a procedural change. That question was discussed in two interesting cases considering earlier but arguably analogous statutory changes:

In 1956, 18 days apart, the Supreme Court decided *Estate of Johnston,* *supra,* 47 Cal.2d 265, and *Estate of Skinker* 47 Cal.2d 290 [303 P.2d 745, 62 A.L.R.2d 1137]. Justice McComb authored the majority opinion in both cases.[15] On one issue the two cases are difficult to reconcile: Whether the right to statutory attorney fees is a procedural right or a substantive one.

In *Johnston,* the issue before the Supreme Court was whether the statutory compensation should be predicated upon the statutory schedule in effect at the decedent's death or upon the increased statutory schedule in effect at the time of making the fee order. (There had been no prior order for compensation before the order that was the subject of the appeal in *Johnston.*) The Supreme Court held that the increased fee schedule applied.

The Foundation relies on the following statement in *Johnston:* "In *Schwan* v. *Superior Court,* 204 Cal. 51 [266 P. 532], it was held that the Legislature was not prohibited from making changes in procedural matters applicable to estates of decedents who died prior to the effective date of such changes. The present change in the law was *a mere procedural change* in which the heirs and devisees have no vested rights." (47 Cal.2d at p. 272, italics added.)

---

[15]Justice McComb also authored *Estate of Lucksinger, supra,* 47 Cal.2d 396, decided 10 days after the *Johnston* case.

*Skinker* involved the question of whether the deduction for statutory compensation for inheritance tax purposes should be based upon the statutory schedule in effect as of the date of the decedent's death (July 9, 1955) or the one in effect during administration of the estate (after the increase in the statutory schedule that became effective September 7, 1955). Although the outcome in *Skinker* was largely dictated by the particular Revenue and Taxation Code language governing the inheritance tax, Harpole relies on the following statements in *Skinker*:

"Extraordinary commissions and fees are different from statutory commissions. Whether any extra fees or commissions should be allowed in a given case, and if so and how much, is committed to the discretion of the court. In the case of statutory commissions and fees, the determination is made by the Legislature. The court's function is limited to a ministerial computation.

"It follows that statutory fees and commissions, such as are involved in this case, are in the nature of fixed charges. The interest thus created, both from the standpoint of the heirs, devisees, the personal representative and the attorney, are *substantive in character and not procedural.*" (47 Cal.2d at p. 297, italics added.)

*Johnston* and *Skinker* may be consistent with one another, but the task of reconciling them is tortuous. Suffice it to say that taken together, they do not provide a clear answer to the question at hand. However, for reasons we are about to explain, reconciling them is unnecessary.

██ Because of the constitutional impropriety of retroactive application of a statutory change impairing a vested right, a statute affecting a vested right will, if possible, be construed to operate only prospectively. (E.g., *Estate of Whiting* (1930) 110 Cal.App. 399, 403-404 [294 P. 502]; *Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585]; *In re Cindy B* (1987) 192 Cal.App.3d 771, 779-780 [237 Cal.Rptr. 677].) Moreover, "[e]ven a procedural statute which may validly be given a retroactive operation will ordinarily, for reasons of fairness, be construed as prospective, unless the legislative intent to make it retroactive clearly appears." (7 Witkin, Summary of Cal. Law (9th ed. 1988), Constitutional Law, § 495, p. 686, and cases cited therein.) The 1987 statute modifying the statutory compensation schedule does not expressly state or otherwise disclose whether the Legislature intended it to operate retroactively. "The Legislature may make a law retroactive in its effect, but only when the intention to do so clearly appears. [Citations.] ' "It is an established canon of interpretation that statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent." ' [Citations.] The rule applies to an amendment to a statute. [Citation.]" (*In re Cindy B, supra,* 192 Cal.App.3d 771, 779-780.)

■ It is distinctly possible that a modification of the rates for statutory fees affects substantial vested rights of an attorney who has already received a statutory fee award, is substantive in nature, and cannot constitutionally be applied retroactively. (See *Estate of Skinker, supra.*)[16] And that possibility, combined with the total absence of any expression of Legislative intent to have the new statutory fee rates operate retroactively to impair the integrity of prior partial statutory fee orders, leads us to conclude that the 1987 modification of the statutory fee rates, whether it effected a substantive change or merely a procedural one, does not operate retroactively to impair the integrity of prior partial statutory fee orders.

*A related contention: the due process argument:*

Judge Olson's refusal to order Harpole to repay any fees awarded in the past was expressly based upon due process grounds. The Foundation contends that the constitutional requirement of due process does not apply to past statutory fee awards to Harpole because that requirement only protects vested or legally enforceable rights and (the Foundation asserts) Harpole's right to retain past statutory fee awards is neither vested nor legally enforceable for all of the herein discussed reasons argued by the Foundation. Whether Harpole's said right is vested or legally enforceable is, in substance, the central issue under consideration in this part. We shall conclude, in substance, that that right is vested and legally enforceable. Accordingly, because Judge Olson did not purport to deny that right, it is not necessary for us to reach the issue of whether a denial of that right would have deprived Harpole of due process, and we express no opinion on that issue.

*The Getty case:*

The Foundation argues that independent of the Legislature's modification of the statutory compensation rates, Judge Olson's finding that the reasonable value of Harpole's statutory services did not exceed $263,000 requires that Harpole refund the statutory fees Harpole received to the extent that those fees exceeded $1,163,000 (the $263,000, plus the $900,000 found by Judge Olson to be the maximum value of the extraordinary services of Harpole for which no award had been made prior to the trial before Judge Olson). This argument in essence seeks to have the court place a "reasonable value" limit on the power of the probate court to award statutory fees. This

---

[16]Of course, the argument that an upward modification of those rates affected substantial vested rights of the heirs and devisees was rejected in *Johnston*, as noted above. However, the nature of the "right" of the heirs and devisees to have a lower fee award made in the future is obviously quite different from the right of an attorney to keep a higher fee award made in the past.

argument was squarely rejected in *Estate of Getty, supra,* 143 Cal.App.3d 455, 465-466, citing *Estate of Buchman* (1955) 138 Cal.App.2d 228 [291 P.2d 547]. ■ As the *Buchman* court observed, "[t]he personal representative and his attorney are entitled to statutory fees as a matter of right, and the fact that the estate is a simple one and the fees larger than would be adequate compensation for the work involved, does not affect the right to the full statutory compensation." (138 Cal.App.2d at 235.)

*The policy considerations:*

Because we have concluded that neither statute nor reported decision provides a definitive answer to the question confronting us, we next look at the policy considerations involved:

1. On the one hand, lawyers should not be overcompensated; and an interpretation of the law that permits the court to rectify overcompensating orders preserves assets for the estate and thereby benefits those on whose behalf probate proceedings are conducted: estate creditors, taxing authorities and beneficiaries.[17]

2. On the other hand, personal representatives need legal assistance, particularly in complex estates; and a rule that prevents an attorney from knowing until the end of a complex and therefore protracted estate proceeding how much he or she will be entitled to retain of prior statutory fee allowances would certainly have a tendency to discourage attorneys from representing a personal representative in protracted estate proceedings, particularly when the attorney's services are being evaluated long after the services have been performed, after time has taken its toll on memories and client and beneficiary gratitude.[18, 19]

■ In balance, we come down on the side of certainty and finality. By section 10830 the probate court is granted the discretion to protect (and the

---

[17]Probate proceedings are designed to marshal assets, pay creditors and taxes, and distribute the assets thereafter remaining on hand to the persons entitled thereto. (See 1 Cal. Decedent Estate Practice (Cont.Ed.Bar 1995) § 2.16, pp. 2-33 to 2-34.)

[18]The case at bar provides an excellent illustration of such a situation. Apparently the probate court back in 1980 believed that at least 70 percent of the statutory services of the personal representative(s)' attorneys had been performed during the period while the estate was being administered by the special administrators. Judge Olson did not find to the contrary. In this estate administration, protracted by extensive litigation and tax disputes, Harpole, which was awarded 70 percent of the estimated statutory fees back in 1980, and performed the services then and incurred the law office overhead then and which presumably paid income taxes on that 70 percent back then at the then-prevailing higher rates and may have spent the money in the meantime, is suddenly confronted, 12 years later, with a claim that it should return more than $319,000 to the estate.

[19]A similar analysis applies to personal representatives' commissions. The prospect of (a) having to wait until the end of a protracted estate for payment, or (b) potentially having to

responsibility for protecting) the estate by declining or cutting back requests for interim fee awards that expose the estate to any risk of overpayment whatsoever. We are confident that the probate court, by nature a conservative entity, can discharge its responsibility adequately in substantially all estate administrations.[20] Given that confidence, we believe that lawyers and personal representatives should be able to know as they proceed during a protracted administration how much they have earned to date by way of statutory fees—or at least how much they can count on retaining toward those fees. Accordingly, we hold that partial allowances of statutory attorney fees are not subject to downward modification once the time to appeal therefrom has expired. The probate court thereafter has no power to order sums paid thereunder refunded by the payee.[21]

*The collateral estoppel effect of the 1989 extraordinary fee award:*

■ There is an additional reason why it would have been improper for the trial court to have ordered Harpole to disgorge any of the fees he has been paid: The 1989 fee award is res judicata that Harpole was entitled to fees *in addition to* the statutory ones it had already been awarded, so that Judge Olson was collaterally estopped from determining in 1994 that Harpole should have to disgorge any of those statutory fees. In opposition to the 1989 extraordinary fee petition, the Foundation specifically contended that the prior fee awards should be considered by the court in determining what to do with that petition, citing *Estate of Walker* (1963) 221 Cal.App.2d 792 [34 Cal.Rptr. 832].[22] The traditional elements of collateral estoppel are present: The parties are the same now as they were in 1989, a different claim is before the court than was before the court in 1989, but the issue before the court now ("was Harpole overcompensated by the interim statutory fee awards") was before the court and litigated back in 1989 and was decided by the court back in 1989. (See *Estate of Gump* (1991) 1 Cal.App.4th 582, 608-609 [2 Cal.Rptr.2d 269]; *Denio* v. *Huntington Beach* (1946) 74 Cal.App.2d 424, 431 [168 P.2d 785].) The Foundation asserts that in reality no request for application of the principle of the *Walker* case was made by it

---

disgorge fees at the conclusion of a protracted estate administration, would discourage many from agreeing to become a personal representative.

[20]We note that the claimed overpayment and right to require repayment in this estate administration arise in large part out of a revision of the statutory fee formula by the Legislature. The probate court cannot be charged with a failure to anticipate that contingency. To require the probate court to do so would render the right to partial allowances of fees illusory, for the probate court could never be confident that even an allowance of a modest percentage of the estimated total statutory fees would not turn out to be excessive if the Legislature drastically reduced the statutory formula.

[21]Obviously the conclusions we have just expressed are subject to qualification in situations involving extrinsic fraud or extrinsic mistake. No such situation is present in the case at bar.

[22]The *Walker* case is discussed at length in part III. B, *post*, of this opinion.

in the 1989 proceedings and that in those proceedings the probate court did not actually pass upon the application of that principle to the 1989 fee petition. We have reviewed the record and have concluded that it does not support these assertions on the part of the Foundation; it demonstrates the contrary instead. The Foundation further argues that the doctrine of res judicata (including collateral estoppel) does not apply when there has been a material change in circumstances—here, the modification of the statutory compensation rates. This argument is inapplicable to the collateral estoppel effect of the 1989 extraordinary fee award, because the modification of the statutory compensation rates became effective in 1987—before the 1989 award.

### B. Did the trial court have the power to deny Harpole additional extraordinary fees?

*What's wrong with the following picture?* An attorney is awarded fees in 1980 and 1984 for services provided during the course of a special administration that ended in 1980. At that point he could have walked away from the case and (as we have concluded above) kept the fees he had been awarded. He does not. Instead, at the request of the executor(s) he performs further extraordinary services over a period extending almost 12 years after the conclusion of the special administration. Except for a relatively small fee award in 1989 for a narrow group of services, he requests and receives nothing else for the services he performed during that almost 12-year period. Then, having devoted (according to his calculations) 5,509 hours of time to extraordinary services during that period for which he has received no compensation (as well as 331 hours of time to extraordinary services during the special administration for which he has received no compensation), he petitions for compensation for those uncompensated extraordinary services when the estate is ready to close at the end of that almost 12-year period. He is awarded *nothing* for those extraordinary services!

Harpole asserts that there are many things wrong with the foregoing picture:

### 1. The res judicata contentions:

Harpole asserts that the probate court's prior statutory fee awards herein are res judicata on the subject of the value of the services for which those awards were made—that those awards establish as a matter of law that the reasonable value of the services for which the prior statutory fee awards aggregating $1,482,653.13 were made was $1,482,653.13—so that the Foundation and the trial court were collaterally estopped from asserting and

concluding that those services had a maximum value of only $263,000. Under this analysis, Harpole concludes that the trial court should have awarded, of the $2,550,000 in extraordinary fees sought by the petition which is the subject of this appeal, all or some substantial portion of the $900,000 the trial court found to be the maximum reasonable value of the theretofore-uncompensated extraordinary services. (Harpole expressly does not contend on this appeal that the trial court's finding that those services had a reasonable value of no more than $900,000 constituted an abuse of discretion or was not supported by the evidence; nor does Harpole otherwise challenge that finding on this appeal.)

While we have hereinabove concluded that partial statutory fee allowances are final in the sense that barring reversal or modification by direct appeal the recipient cannot be ordered to disgorge sums paid thereunder, nothing we have stated above is determinative on the question of whether the amounts of those prior allowances can be considered in determining how much, if any, to award in response to future petitions for extraordinary fees.

In arguing that prior statutory fee allowances can be considered in determining requests for extraordinary fees, the Foundation relies primarily on two cases: *Estate of Walker*, *supra*, 221 Cal.App.2d 792, and *Estate of Trynin* (1989) 49 Cal.3d 868 [264 Cal.Rptr. 93, 782 P.2d 232].

In *Walker*, the first and final account of the executor sought an allowance to his attorney of $1,000 in extraordinary fees. The statutory fees were $6,085.80. The trial court's order denied any extraordinary fees, finding that "the statutory fees paid to the . . . [executor's] attorney are adequate and fair compensation for all services rendered to and for said estate by the . . . [executor's] attorney." The attorney appealed from that order, making two contentions: (1) that it was mandatory for the court to order *some* fees for the extraordinary services performed, and (2) that even if it was not, the trial court abused its discretion in denying any extraordinary fees. (As noted above, in the case at bar Harpole makes only the first of those two contentions.) The Court of Appeal affirmed, stating: "The language of the Probate Code makes it clear that the allowance of fees for extraordinary services rendered in probate proceedings by executors, administrators and their attorneys is discretionary with the probate court. In making an allowance for such services, or in disallowing a claim therefor, the court may take into consideration all matters relating to the administration of the particular estate, such as the value of the estate, the kind and character of the assets, the effort involved in the care and preservation of estate property, and such other facts as bear upon the labor and effort of the executor, administrator and attorney in the routine administration of the estate. Finally, the amount of the

ordinary fees to which such persons are entitled under the provisions of sections 901 and 910 [the then-current Probate Code sections providing for the statutory commissions of personal representatives and the statutory and extraordinary fees of their attorneys] may be considered, and if, under all the facts and circumstances bearing upon the administration of the estate, the sum allowed by law as ordinary compensation appears to be adequate, just and reasonable compensation for all services rendered, even though some extraordinary services may have in fact been performed, the probate court may, in the exercise of the discretion conferred upon it by the statute, disallow all claims for extraordinary compensation. [Citations.] The purpose of the Legislature in enacting sections 902 and 910 [providing for extraordinary commissions and fees of personal representatives and their attorneys] was to allow extra compensation to be granted in proper cases, but only where extraordinary services are not adequately compensated by the statutory fees established by section 901." (221 Cal.App.2d at 795-796.) (The court then proceeded to evaluate and reject the contention that the refusal to allow any extraordinary fees constituted an abuse of discretion.)

We have found eight reported California cases that have cited *Walker*,[23] and none has qualified *Walker*'s holding or cast any doubt upon its reasoning. On the contrary, at least two of those eight cases specifically indicate that the *Walker* case is good law supporting denial of additional extraordinary fees where extraordinary fees previously awarded plus statutory fees adequately compensate for all services performed: *Estate of Downing, supra*, 134 Cal.App.3d 256, 267, 272; and *Estate of Trynin, supra*, 49 Cal.3d 868, 880. In *Downing*, the denial of additional extraordinary fees was affirmed on appeal. In *Trynin*, the trial court's determination that it was powerless to award additional extraordinary fees for the specific type of services performed (services in connection with prosecuting the attorneys' earlier extraordinary fee petitions) was reversed so that the trial court could consider whether to award additional extraordinary fees; however, in reversing, the Supreme Court specifically indicated that if upon remand the trial court found the right set of circumstances, denial of the request for the additional extraordinary fees would not be improper: "We conclude . . . that extraordinary services compensible under section 910 include work reasonably performed by the attorney to establish and defend the fee claim. This does not mean, however, that an additional award of fees for fee-related services

---

[23]*Estate of Trynin, supra*, 49 Cal.3d 868, 874, 880; *Estate of Beach* (1975) 15 Cal.3d 623, 645 [125 Cal.Rptr. 570, 542 P.2d 994]; *People v. Cavanaugh* (1968) 69 Cal.2d 262, 271 [70 Cal.Rptr. 438, 444 P.2d 110]; *Estate of Billings* (1991) 228 Cal.App.3d 426, 432 [278 Cal.Rptr. 439]; *Estate of Downing* (1982) 134 Cal.App.3d 256, 267, 268, 272 [184 Cal.Rptr. 511]; *Estate of Lacy* (1975) 54 Cal.App.3d 172, 181 [126 Cal.Rptr. 432]; *Estate of Turino* (1970) 8 Cal.App.3d 642, 649 [87 Cal.Rptr. 581]; *Estate of Gopcevic* (1964) 228 Cal.App.2d 280, 282 [39 Cal.Rptr. 482].

is invariably required. Where the trial court reasonably concludes that the amounts previously awarded the attorney for both ordinary and extraordinary services are adequate, given the value of the estate and nature of its assets, to fully compensate the attorney for all services, including fee-related services, denial of a request for fee-related fees would not be an abuse of discretion. (Cf. *Estate of Walker, supra,* 221 Cal.App.2d 792, 795.)" (49 Cal.3d at 880.)

We believe that *Walker, Downing* and *Trynin* are dispositive of the issues raised by Harpole's appeal. ▮▮▮ Each stands for the principle[24] that the probate court has discretion to deny extraordinary fees where the statutory fees reasonably compensate for the statutory services and the theretofore-uncompensated extraordinary services. *Downing* and *Trynin* further establish that this is true even where there have previously been awards of some statutory and extraordinary fees in the estate.[25]

Harpole attempts to distinguish *Walker* and *Trynin* on several grounds.

First, Harpole asserts that *Walker* is a Court of Appeal case, is therefore not binding upon us, and that we should not follow it. We disagree. Not only do we consider *Walker* to be well reasoned, but in *Trynin* the Supreme Court expressly endorsed *Walker*'s reasoning.

Next, Harpole asserts that neither *Walker* nor any of the eight cases that have cited it state that a statutory fee award that has become final can be considered in determining whether to award extraordinary fees, Harpole's theory being that statutory fee awards that have become final establish as a matter of res judicata that the statutory services had a reasonable value equal to the amount of the statutory fee award so that any extraordinary services must have a value separate from and in addition to the statutory fees. In substance, this contention would limit the probate court, in applying the

---

[24]That principle is hereinafter sometimes referred to as "the *Walker* principle."

[25]Harpole contends that the *Trynin* opinion does not disclose whether there were any previous awards of statutory fees in that case. That contention overlooks at least two passages in the opinion:

(1) In the second paragraph on page 872 of 49 Cal.3d, the opinion recites that the objectors took the position on the underlying fee petition (that is, the fee petition compensation for the prosecution of which was sought by the fee petition before the Supreme Court) "that no *further* amount was owing and, indeed, that petitioners *had been overpaid.*" (Italics added.)

(2) In the above quoted first paragraph on page 880 of 49 Cal.3d, the opinion states, "Where the trial court reasonably concludes that the amounts previously awarded for *both ordinary and* extraordinary services are adequate . . . to fully compensate the attorney for all services . . . , denial of a request for fee-related fees would not be an abuse of discretion." (Italics added.) While possible, it is unlikely that the Supreme Court would have used the italicized language on page 880 if *Trynin* had involved a situation where statutory fees had not previously been awarded.

*Walker* principle, to considering only the value of statutory services that are not the subject of a fee award that has become final at the time the further fee petition is before that court.

In three of the eight cases that have cited *Walker* it appears that there was a prior statutory fee award.[26] None of those three cases discusses the question of whether such prior award would preclude the probate court from revaluing the statutory services in applying the *Walker* doctrine to an extraordinary fee request. In part III. A, *ante*, we held that the res judicata effect of a prior statutory fee award precludes the probate court from revisiting the *amount* of the award. However, we believe that the res judicata effect of a pre-1987 statutory fee award (at least where, as here, the award is of only part of the statutory fees) does not establish the *value of the services* compensated thereby:

A. In making a partial award toward statutory fees, the probate court does not need to attempt to fix a precise value on the statutory services performed to date, but only to estimate the total statutory services that will be required in the estate proceedings and to endeavor to make certain that the statutory services performed to date are a large enough proportion of that total to justify the partial award. We are cited to no substantial evidence before Judge Olson herein that in making the prior allowances toward statutory fees the probate court placed a value on the statutory services performed up to that time. (See fn. 14, *ante*.)

B. More fundamentally, Harpole's contention assumes that the pre-1987 statutory formula for calculating statutory fees established the "value" of the services for which statutory fees are allowed. Not so. The statutory formula merely established an arbitrary number as the *amount of the fees to be awarded*. It was not designed to establish, and substantially never established, the exact *value* of the statutory services. It typically undercompensated or overcompensated the attorney. Its justification, however, lay in the Legislative determination that *on the average and in the long run*, attorneys who handle a reasonable number of estates would be properly compensated for the reasonable value of the statutory services they perform.[27] For example, while the amount of work involved in handling the average $500,000 estate is not all that much more than (and perhaps no more than) is involved in handling the average $221,250 estate, the statutory fee for the $500,000

---

[26]*Estate of Trynin, supra,* 49 Cal.3d 868, 872, 880; *Estate of Beach, supra,* 15 Cal.3d 623, 646; *Estate of Billings, supra,* 228 Cal.App.3d 426, 428-429.

[27]See *Estate of Getty, supra,* 143 Cal.App.3d 455, 465-466, quoting from *Estate of Buchman, supra,* 138 Cal.App.2d 228, 235 (" 'Those undertaking the duties of offices of this character [personal representatives and the attorneys therefor] take the bitter with the sweet.' ").

estate ($11,150) is twice the fee for the $221,250 estate ($5,575). Even when factors such as the amount of responsibility and the ability of the estate to pay are taken into account, ordinarily it cannot be said that the *reasonable value* of the services in the larger estate are twice that of the services in the smaller estate. The Legislature merely determined, in substance, that any undercompensation involved in handling small estates would be equitably adjusted in the long run by overcompensation in handling larger estates.[28]

Accordingly, we hold that the prior statutory fee awards of $1,482,653.13 to Harpole do not establish that Harpole's statutory services had a value of $1,482,653.13—or of any other specific amount.

Harpole's most persuasive argument against application of the *Walker* principle to the $2,550,000 fee petition is one that is also discussed in part III. A, *ante*: that the prior extraordinary fee awards (particularly the 1989 one, in opposition to which the Foundation specifically raised the *Walker* case) are res judicata that it was entitled to fees in addition to the statutory ones he had already been awarded—res judicata that it had not been over-compensated for statutory services as of the time the 1989 extraordinary fee award was made, so that Judge Olson was collaterally estopped from deter-mining in 1994 that he had been. While we concluded above that at least the 1989 award was res judicata on the question of whether Harpole could be ordered to disgorge any statutory fees previously awarded, no prior awards operate as res judicata to prevent Judge Olson from considering the amount of those awards in determining whether Harpole had theretofore already been adequately compensated for the extraordinary services that were the subject of his $2,550,000 petition. It does not logically follow from (a) findings by the probate court in 1984 and 1989 in effect establishing that the *$1,482,653.13* aggregate statutory fees theretofore allowed were inadequate to compensate Harpole for certain extraordinary services (those which were the subject of the extraordinary fee awards made in 1984 and 1989), that (b) the *$1,856,123.13* aggregate statutory and extraordinary fees allowed as of 1994 were inadequate to compensate Harpole for all services (including those that were the subject of the $2,550,000 petition).

It is true that it can be argued that if it took $48,870 in 1989 to bring Harpole's aggregate level of compensation up to "reasonable" and if the reasonable value of the extraordinary services encompassed by the $2,550,000 petition was $900,000, it must follow that Harpole is entitled to

---

[28]The observations made by us in the paragraph of text to which this footnote is appended of course also are applicable to the statute as amended effective in 1987, except as to that portion of statutory fees based on the value of the estate accounted for in excess of $25 million.

at least $900,000 on that petition. The flaw in this syllogism is that the $900,000 figure focuses only upon the value of the extraordinary services compensation for which is sought by the $2,550,000 petition. Proper application of the *Walker* principle requires that the probate court focus on the aggregate value of *all* of the services performed by the attorney, both statutory and extraordinary. Judge Olson did this and came up with a maximum of $1,163,000—less than the $1,856,123.13 theretofore allowed.

A further refinement of this argument runs as follows: if it took $48,870 in 1989 to bring Harpole's aggregate level of compensation up to "reasonable" and if the probate court in 1989 did not yet have before it huge amounts of additional extraordinary services for which compensation was not sought until 1992, how can the trial court now conclude that the services *including* these huge additional amounts of additional services have a reasonable value no greater than the services (as of 1989) *not including* these huge additional amounts? The answer lies in sort of a "straw-that-breaks-the camel's-back" analysis.[29] Again, it is possible and permissible for a judge, taking a fresh look at a new situation, to conclude that while additional fee awards had been justified up to that time, no more fees were necessary in order to reasonably compensate for the services theretofore performed, even if those services included ones involving vast amounts of time that had not theretofore been considered by the probate court. Each new extraordinary fee petition entitles the probate court (and requires the probate court) to re-ask itself the question: has what has been heretofore awarded adequately compensated for not only the services heretofore brought before the court but also the services currently being brought before the court. If the answer is "yes," the *Walker* principle authorizes the denial of the current extraordinary fee petition.

It should also be noted that the use of the *Walker* principle is, as articulated both in *Walker* itself and in subsequent cases such as *Trynin*, discretionary with the trial court. Both Walker and Trynin used permissive rather than mandatory language in discussing the trial court's power to deny extraordinary fees if the other sums allowed were adequate compensation for all services rendered.[30] (See also *Estate of Lacy, supra,* 54 Cal.App.3d 172, 181 [trial court did not abuse its discretion in awarding extraordinary fees, notwithstanding contention that ordinary fees adequately compensated for all

---

[29]Perhaps a more appropriate term might be "the elephant that broke the camel's back," in light of the $2,550,000 sought by the petition before Judge Olson in comparison to the $1,856,123.13 theretofore awarded.

[30]In *Walker,* the court stated that "the amount of the ordinary fees . . . *may* be considered, and if . . . the sum allowed by law as ordinary compensation appears to be adequate, just and reasonable compensation for all services rendered, . . . the probate court *may,* in the exercise

services].) We do not mean to decide today whether the probate court may in its discretion refuse to apply the *Walker* principle—that is, whether the trial court (perhaps for some reason unrelated to the reasonableness of compensation) can grant an extraordinary fee petition even if it finds that the other fees awarded and to be awarded the attorney will be adequate, just and reasonable compensation for all services rendered by the attorney. What we do decide today in this regard is that any contention that the trial court here could not properly conclude that the huge amount of additional extraordinary services presented by the $2,550,000 fee petition justified no compensation above that which had been allowed before that huge amount of services was even before the court, is in essence a contention that the trial court abused its discretion—a contention (as we have heretofore noted and as we shall discuss in greater detail in part III. B. 8, *post*) not presented by the within appeal.

2. *The argument that "the statutory fees should be ignored in applying the Walker principle":*

From the foregoing analysis one might well ask: if the formula for statutory fees is designed in effect to overcompensate the attorney in the large estates to make up for undercompensation in the small estates, doesn't this mean that in the mix of factors determinative of the amount (if any) of extraordinary fees to be awarded, the probate court should not include the value of the statutory services performed by the petitioning attorney? The answer is "no." The correct analysis is that the value of the statutory services is still to be included in the mix, but the size of the estate is an important consideration in determining the value of the statutory services. The language of Judge Olson's order denying Harpole's petition reflects that he addressed the matter in precisely that way. The approach was aptly described in *Estate of Fulton* (1937) 23 Cal.App.2d 563 [73 P.2d 664], a precursor of *Walker*: "[The statute authorizing allowances of extraordinary fees] leaves the matter within the sound discretion of the trial court, and does not make it mandatory upon the court to grant extra allowance of fees on account of services. In making such allowance or disallowing a claim therefor, the trial court necessarily takes into consideration *the value of the estate*, the work performed by the attorney in the *routine* administration thereof, and the amount to which the attorney would legally be entitled, calculated according to the provisions of the Probate Code, and if the sum allowed by law appears

---

of the discretion conferred upon it by the statute, disallow all claims for extraordinary compensation." (*Estate of Walker, supra,* 221 Cal.App.2d 792, 795, italics added.)

In *Trynin,* the court stated that "[w]here the trial court reasonably concludes that the amounts previously awarded . . . are adequate . . . to fully compensate the attorney for all services, . . . denial of a request for fee-related fees would not be an *abuse of discretion.*" (*Estate of Trynin, supra,* 49 Cal.3d 868, 880, italics added.)

to be a reasonable compensation, even though the attorney may have performed some extraordinary services, it is within the sound discretion of the trial court to disallow claims for extra compensation, and unless it appears that there has been an abuse of discretion, an appellate court is not at liberty to disturb the conclusion of the trial court." (23 Cal.App.2d at 567, italics added.)

3. *The "Walker only involved $1,000" argument:*

Harpole points out that *Walker* involved a request for only $1,000 in extraordinary fees and argues that *Walker* should not govern a case involving a $2,550,000 extraordinary fee request. In the absence of any reason proffered by Harpole as to why the *Walker* principle should apply only to small fee requests and not large ones, we find the size of the fee requests in the two cases to be a difference without a distinction.

4. *The "Trynin was only dictum" argument:*

Harpole notes that a determination of whether the probate court could revisit the value of the statutory services in applying the *Walker* doctrine was not necessary to the Supreme Court's decision in *Trynin,* and Harpole therefore argues that we are free to disregard as dictum *Trynin*'s above quoted admonitions to the trial court concerning the *Walker* principle. The Foundation responds by citing cases that hold that a statement in an opinion that is responsive to an argument presented by counsel and is intended for guidance of the court and the attorneys on a new trial "probably cannot be put aside as mere dictum." (*United Steelworkers of America* v. *Board of Education* (1984) 162 Cal.App.3d 823, 834-835 [209 Cal.Rptr. 16]; *Paley* v. *Superior Court* (1955) 137 Cal.App.2d 450, 460 [290 P.2d 617].) This maxim is inapplicable to *Trynin* because the *Trynin* opinion does not disclose whether the *Walker* principle was argued by counsel in that case. However, the citations of the Foundation that are applicable are those that state the principle that even dictum of the Supreme Court should be considered persuasive. (E.g., *United Steelworkers of America* v. *Board of Education, supra,* 162 Cal.App.3d at p. 835; *County of Fresno* v. *Superior Court* (1978) 82 Cal.App.3d 191, 194 [146 Cal.Rptr. 880] ["Dicta are not to be ignored. Dicta may be highly persuasive, particularly where made by the Supreme Court after that court has considered the issue and deliberately made pronouncements thereon intended for guidance of the lower court upon further proceedings."].) We believe that the Supreme Court's direction to the trial court in *Trynin* that upon remand it may take prior fee awards and prior services into account (in substance revisiting the value of services that have generated prior fee awards) is sound law, and we shall follow that law herein.

5. *The argument that "Walker should only apply to fee-related fees cases"*:

Harpole asserts that even if *Trynin*'s endorsement of the *Walker* principle is good law, because *Trynin* only dealt with the "fee-related fees" issue we should limit that endorsement to "fee-related fees" cases and not deem it applicable to the case at bar. Again, in the absence of any persuasive reason proffered by Harpole as to why the Walker principle should apply in "fee-related fees" cases and not in cases involving fees for services unrelated to fees, we find the difference between the two types of cases to be one without a distinction.

6. *The "unconstitutional conscription" argument*:

Harpole contends that denying it compensation for extraordinary services is unconstitutional in that it conscripts it for services without compensation. Assuming that Harpole is serious in so contending, we shall dispose of this contention summarily by noting that (1) Harpole was not forced to perform any services herein, and (2) the trial court in substance held that it *was* compensated for the extraordinary services herein (albeit by prior fee awards).

7. *The "special administrators v. executors" argument*:

 Harpole contends that *Walker* notwithstanding, the trial court could not properly take into account the prior statutory fee awards because those were made for services Harpole rendered to the special administrators during the course of the special administration of the Estate, whereas virtually all of the services involved in the $2,550,000 extraordinary fee petition were services performed for the executor(s) during the course of the general administration.[31] That this contention again rests upon a difference without a distinction is demonstrated by the fact that the Probate Code does not provide one formula for calculating statutory fees for the attorney for the special administrator and a separate formula for calculating statutory fees for the attorney for the general personal representative. Instead, section 10810 (and its predecessors, §§ 901 and 910) contemplate an aggregate amount of statutory attorney fees, to be apportioned (in the case of attorneys serving in sequence) between the various attorneys representing the personal representative(s), whether special administrator or general personal representative.

---

[31]Harpole also contends that even if the trial court *had the power to* take the prior statutory fee awards into account, it *should not have* done so because of the fact that those awards were for services rendered to the special administrators during the special administration, unlike virtually all of the extraordinary fees sought by the $2,550,000 fee petition. This contention is governed by the discussion at part III. B. 8, *post.*

The statutory services rendered by Harpole to the special administrators remained open after the end of the special administration for valuation by the probate court in determining a fair apportionment of the theretofore unallowed portion of the statutory fees, and we have been presented with no persuasive argument that they cannot also remain open for valuation in applying the *Walker* principle.

8. *The "abuse of discretion" contentions*:

Harpole makes 10 other contentions as to why denying anything toward the $2,550,000 request was error:

(a) The trial court failed adequately to take into account the enormous size of the Estate.

(b) In valuing Harpole's services performed over the years, the trial court failed to take inflation into account.

(c) Fees for services performed in the distant past should be compensated at current rates, whereas the trial court here used outdated rates.

(d) The services which were the subject of the $2,550,000 petition were extremely important.

(e) The services which were the subject of the $2,550,000 petition were extremely time-consuming.

(f) Even the expert called on behalf of the Foundation and the Attorney General testified that Harpole's work was good and workmanlike.

(g) In 1986 (in the course of recommending to the probate court that Harpole be hired to perform the services that resulted in the $48,870 extraordinary fee award), the deputy attorney general appearing in the Estate proceedings made complimentary remarks concerning Harpole.

(h) In 1989, the attorney for the Foundation, in arguing for the application of the *Walker* principle to Harpole's $48,870 fee petition, stated that the Foundation was not arguing that Harpole should receive *nothing* for the post-1983 work nor that the *Walker* principle required that Harpole receive *nothing* for that work. These statements were inconsistent with the Foundation's position—adopted by Judge Olson—that by reason of the *Walker* principle, Harpole should receive nothing for the work which was the subject of the $2,550,000 petition.

(i) Approximately 94 percent of the time devoted to the services that were the subject of the $2,550,000 petition was devoted on behalf of the executor(s), after the close of the special administration. Yet the trial court used fees awarded almost entirely for services performed during the special administration to justify denying the $2,550,000 petition.

(j) The trial court erred in concluding that executor Bates (and, by extension, Harpole) was merely a stakeholder and should have played a much more passive role in the Estate—and therefore erred in attributing little value to Harpole's services concerning many contested Estate matters.

Evaluating any of these 10 contentions would require us to evaluate whether, considering all of the applicable facts and circumstances, the trial court abused its discretion in valuing Harpole's services at the $1,163,000 maximum value placed thereon. However, as noted above, on this appeal Harpole expressly does not challenge the trial court's findings as to the value of Harpole's services;[32] and we have not been presented with the detailed analysis of the record on appeal that would be essential to a determination of whether those findings constituted an abuse of discretion—a detailed analysis setting forth (with supporting citations to the record) the evidence supporting and opposing the trial's court's valuation findings. "[T]o effectively raise the issue of the sufficiency of the evidence, the appealing party must present to the appellate court all of the evidence touching upon the question involved. When the appellant fails to abide by this well established and necessary rule of appellate practice, the appellate court is entitled to indulge in a presumption that the evidence sustains the determination of the trial court." (*Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 874 [105 Cal.Rptr. 395]. Accord, e.g., *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Kruckow* v. *Lesser* (1952) 111 Cal.App.2d 198, 200 [244 P.2d 19], and cases cited

---

[32]The following passages appear in Harpole's opening brief:

"[Harpole] has opted not to attack the sufficiency of the trial court's valuation finding in this brief because of the restrictive standard of review.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Because Mr. Harpole does not, in this appeal, challenge Judge Olson's finding that the reasonable historical value of Mr. Harpole's extraordinary services was no more than $900,000, Mr. Harpole will simply summarize the services rendered during the period of executorship for which extraordinary compensation is sought.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Once again, because Mr. Harpole does not herein challenge the trial court's finding that the reasonable historical value of his extraordinary services is no more than $900,000, it is unnecessary to detail the plethora of evidence which supported Mr. Harpole's claim below that he rendered extraordinary services in the amount of $2,550,000."

therein.) In view of the lack of challenge of those findings by Harpole and the absence from Harpole's briefs (and, therefore, obviously, from the Foundation's briefs) of the necessary analysis of the record on this subject, we decline to consider these 10 contentions.

At this juncture we return to the question posed above: *what's wrong with the picture presented at the beginning of part III. B of this opinion?* For reasons we have just recited, *we cannot answer the question.* At first blush, it seems somewhat unfair for Harpole to have devoted vast amounts of time to extraordinary services over a period of more than 12 years for which it has not been paid and then to find out that it is to be paid nothing for those services. Had Harpole known up front that it would receive nothing for those services, presumably it would have left them to be performed by another attorney, upon whom the *Walker* principle would have had little or no impact and who would have been entitled to receive compensation therefor from the estate. The difficulty is that *Walker* and its progeny allow for such a possibility and leave it to the probate court's discretion to avoid injustice in applying the *Walker* principle, by fairly determining what the value of the services performed are. In a situation where the appellant does not contend that the trial court abused its discretion in determining that value and does not present us with briefing that enables us to review the exercise of that discretion, we cannot say that the trial court abused that discretion. Certainly the express findings of Judge Olson support his decision. Whether those findings are supported by the evidence would be inappropriate for us to determine on this appeal.[33]

### 9. *Miscellaneous other contentions*:

We have reviewed the various other subsidiary contentions made by Harpole and find them to be without merit.

---

[33]What object lesson is to be learned from this case? When an attorney's fees are dependent upon court authorization or approval, the attorney should seek that authorization or approval as soon and as often within reason as the law permits. It is a tactical error for the attorney to wait until the end, running the risk that he or she will find out that he or she has performed vast amounts of services for free or at greatly reduced rates. It is far better to find out *before* performing more services that under the *Walker* principle the probate court feels that past compensation and future statutory compensation justify reducing or eliminating further compensation for extraordinary services. It is far better to minimize the amount of extraordinary fees exposed to application of the *Walker* principle.

The practice of waiting until an order requiring the presentation of any fee petitions is made is particularly unwise. The probate court may get the impression that if it never had made the order, the fee request would never have been presented—that the attorney involved had felt adequately compensated by prior fee orders, had in substance "written off" the services that had not been presented by a prior fee petition and had not intended to seek compensation therefor, but was motivated to change his or her mind by the fact that the probate court's order seemed to provide a opportunity to seek more fees and an implicit suggestion that the court contemplated the possibility of awarding more fees. Such an impression is not likely to motivate the probate court to view the belated fee request kindly.

## IV. DISPOSITION

The order of the trial court is affirmed. Each party is to bear its own costs on appeal.

Johnson, Acting P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied May 13, 1996, and the petition of petitioners and appellants for review by the Supreme Court was denied July 17, 1996.